No. 24-1398

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

————————————

VALERIE KLOOSTERMAN,

*Plaintiff-Appellant,*

v.

METROPOLITAN HOSPITAL et al.,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court
for the Western District of Michigan
No. 1:22-CV-944-JMB-SJB

————————————

## OPENING BRIEF FOR PLAINTIFF-APPELLANT
## VALERIE KLOOSTERMAN

————————————

JEFFREY C. MATEER
DAVID J. HACKER
DOUG PETERSON
ROGER L. BYRON
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy. #1600
Plano, TX 75075

KAYLA A. TONEY
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW #1410
Washington, DC 20004

ERIN E. MURPHY
KEVIN WYNOSKY*
  *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
kevin.wynosky@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiff-Appellant*

July 31, 2024

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-appellant Valerie Kloosterman certifies under Sixth Circuit Rule 26.1 that she is a natural person and that no publicly owned corporation not a party to the appeal has a financial interest in the outcome.

s/Kevin Wynosky
Kevin Wynosky

## STATEMENT REQUESTING ORAL ARGUMENT

Plaintiff-appellant Valerie Kloosterman requests oral argument under Federal Rule of Appellate Procedure 34(a) and Sixth Circuit Rule 34(a).  This appeal raises important questions about enforcing arbitration agreements, and at least one implicates a potential circuit split.  Oral argument will aid the Court's resolution of these questions.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

STATEMENT REQUESTING ORAL ARGUMENT ............................................ ii

TABLE OF AUTHORITIES ................................................................................. v

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 4

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................. 6

    A.    Factual Background .......................................................................... 6

    B.    Procedural Background .................................................................... 12

STANDARD OF REVIEW ................................................................................. 16

SUMMARY OF THE ARGUMENT .................................................................. 16

ARGUMENT ..................................................................................................... 19

I.    The Hospital Forfeited Its Right To Arbitrate ............................................ 19

    A.    This Court's Caselaw Confirms that the Hospital Forfeited Any Right to Arbitrate by Acting Inconsistently With the Right ............................................................................................... 19

    B.    The Text and Historical Construction of the FAA Confirm that the Hospital Forfeited Any Arbitration Right ...................................... 30

II.    The Arbitration Clause's Cost-Splitting Provision Renders It Unenforceable ........................................................................................... 33

    A.    *Morrison* Renders the Cost-Splitting Provision Unenforceable .................................................................................. 35

    B.    The Cost-Splitting Provision Cannot Be Severed ............................. 37

III.    Claims Against The Individual Defendants Belong In Federal Court ........... 40

A.    The District Court Erred by Embracing an Argument that the Individual Defendants Never Made ...................................................... 40

B.    The District Court Erred by Allowing Nonparties to Enforce an Agreement Expressly Barring Nonparty Enforcement.................. 42

C.    The District Court Erred by Concluding that Michigan Law Allows Nonparties to Enforce an Agreement Against a Party Based on an Agency Relationship Alone ........................................... 43

CONCLUSION .................................................................................................... 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

DESIGNATION    OF    RELEVANT    ORIGINATING    COURT DOCUMENTS

# TABLE OF AUTHORITIES

## Cases

*AFSCME Council 25 v. Wayne Cnty.*,
  811 N.W.2d 4 (Mich. Ct. App. 2011)....................................................44

*AFSCME v. City of Detroit*,
  704 N.W.2d 712 (Mich. Ct. App. 2005) ...........................................37

*Altobelli v. Hartmann*,
  884 N.W.2d 537 (Mich. 2016) ...................................... 18, 43, 46, 47

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013).........................................................................35

*Am. Locomotive Co. v. Gyro Process Co.*,
  185 F.2d 316 (6th Cir. 1950)...........................................................22

*Armstrong v. Michaels Stores, Inc.*,
  59 F.4th 1011 (9th Cir. 2023)..........................................................24

*Arnold v. Arnold Co.*,
  920 F.2d 1269 (6th Cir. 1990).........................................................41

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).................................................................. 30, 31

*AtriCure, Inc. v. Meng*,
  12 F.4th 516 (6th Cir. 2021)............................................................41

*Azar v. Allina Health Servs.*,
  587 U.S. 566 (2019).........................................................................32

*Bienenstock & Assocs., Inc. v. Lowry*,
  887 N.W.2d 237 (Mich. Ct. App. 2016) ...........................................43

*Boykin v. Family Dollar Stores of Mich., LLC*,
  3 F.4th 832 (6th Cir. 2021)..............................................................16

*Bromley v. Mich. Educ. Ass'n*,
  82 F.3d 686 (6th Cir. 1996).............................................................39

*Brown v. Pac. Life Ins. Co.*,
   462 F.3d 384 (5th Cir. 2006) ................................................................................44

*Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*,
   50 F.3d 388 (7th Cir. 1995) ......................................................................... 29, 30

*Champness v. J.D. Byrider Sys., LLC*,
   No. 14-730, 2015 WL 247924 (S.D. Ohio Jan. 20, 2015) ................................36

*Chi. Teachers Union v. Hudson*,
   475 U.S. 292 (1986) ...........................................................................................39

*City of Detroit Police & Fire Ret. Sys. v. GSC CDO Fund Ltd.*,
   No. 289185, 2010 WL 1875758 (Mich. Ct. App. May 11, 2010) ............... 44, 45

*Coates v. Bastian Bros., Inc.*,
   741 N.W.2d 539 (Mich. Ct. App. 2007) ...................................................... 42, 43

*Cole v. Burns Int'l Sec. Servs.*,
   105 F.3d 1465 (D.C. Cir. 1997) .........................................................................36

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985) ...........................................................................................22

*Doctor's Assocs., Inc. v. Distajo*,
   66 F.3d 438 (2d Cir. 1995) .................................................................................30

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) ...........................................................................................29

*Forby v. One Techs., L.P.*,
   909 F.3d 780 (5th Cir. 2018) ..............................................................................23

*Galion Iron Works & Mfg. Co. v. J.D. Adams Mfg. Co.*,
   128 F.2d 411 (7th Cir. 1942) ..............................................................................33

*Gen. Star Nat'l Ins. Co. v. Administratia Asigurarilor de Stat*,
   289 F.3d 434 (6th Cir. 2002) ..............................................................................23

*Gerber v. Riordan*,
   649 F.3d 514 (6th Cir. 2011) ..............................................................................26

*Germany v. River Terminal Ry. Co.*,
  477 F.2d 546 (6th Cir. 1973) ...............................................................25

*Greenlaw v. United States*,
  554 U.S. 237 (2008) ...........................................................................41

*Gunn v. NPC Int'l, Inc.*,
  625 F. App'x 261 (6th Cir. 2015) ........................................................22

*Gutierrez v. Wells Fargo Bank, NA*,
  889 F.3d 1230 (11th Cir. 2018) ..........................................................30

*Hooper v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*,
  589 F.3d 917 (8th Cir. 2009) .................................................... 1, 21, 24

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002) ..............................................................................43

*Hurley v. Deutsche Bank Tr. Co. Ams.*,
  610 F.3d 334 (6th Cir. 2010) ..............................................................22

*Imbrunone v. Sch. Dist. of Hamtramck*,
  No. 22-12346, 2023 WL 5489022 (E.D. Mich. Aug 24, 2023) ................. 35, 36

*In re Pawn Am. Consumer Data Breach Litig.*,
  --- F.4th ---, 2024 WL 3366702 (8th Cir. 2024) ................................28

*Javitch v. First Union Sec., Inc.*,
  315 F.3d 619 (6th Cir. 2003) ..............................................................44

*Johnson Assocs. Corp. v. HL Operating Corp.*,
  2010 WL 4942788 (M.D. Tenn. Nov. 30, 2010) ..................................21

*Johnson Assocs. Corp. v. HL Operating Corp.*,
  680 F.3d 713 (6th Cir. 2012) ...................................................... *passim*

*King v. Taylor*,
  694 F.3d 650 (6th Cir. 2012) ..............................................................26

*La Nacional Platanera, S.C.L. v. N. Am. Fruit & S.S. Corp.*,
  84 F.2d 881 (5th Cir. 1936) ................................................................33

*Madison Dist. Pub. Schs. v. Myers*,
637 N.W.2d 526 (Mich. Ct. App. 2001) ............................................................30

*Manasher v. NECC Telecom*,
310 F. App'x 804 (6th Cir. 2009)........................................................................25

*Marie v. Allied Home Mortg. Corp.*,
402 F.3d 1 (1st Cir. 2005) ...................................................................................30

*McCoy v. Walmart, Inc.*,
13 F.4th 702 (8th Cir. 2021)................................................................................25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614 (1985)..............................................................................................29

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) ..................................................................................... *passim*

*Morrison v. Circuit City Stores, Inc.*,
317 F.3d 646 (6th Cir. 2003)................................................... 5, 35, 36, 37

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)..................................................................................................31

*NuVision v. Dunscombe*,
415 N.W.2d 234 (Mich. Ct. App. 1987) .............................................................30

*O.J. Distrib., Inc. v. Hornell Brewing Co.*,
340 F.3d 345 (6th Cir. 2003)...............................................................................23

*Powell v. Sparrow Hosp.*,
No. 10-206, 2010 WL 2901875 (W.D. Mich. July 23, 2010)............................40

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
388 U.S. 395 (1967)..............................................................................................28

*Prof'l Rehab. Assocs. v. State Farm Mut. Auto. Ins. Co.*,
577 N.W.2d 909 (Mich. Ct. App. 1998) .............................................................40

*Radiator Specialty Co. v. Cannon Mills, Inc.*,
97 F.2d 318 (4th Cir. 1938)................................................... 17, 31, 32, 33

*Rankin v. Allstate Ins. Co.*,
  336 F.3d 8 (1st Cir. 2003) ...................................................................20

*Rory v. Cont'l Ins. Co.*,
  703 N.W.2d 23 (Mich. 2005) ......................................................... 37, 38

*Sandler v. All Acquisition Corp., Inc.*,
  954 F.2d 382 (6th Cir. 1992) .............................................................29

*Schwebke v. United Wholesale Mortg. LLC*,
  96 F.4th 971 (6th Cir. 2024) ...................................................... *passim*

*Shy v. Navistar Int'l Corp.*,
  781 F.3d 820 (6th Cir. 2020) .............................................................23

*Smith v. GC Servs. Ltd. P'ship*,
  907 F.3d 495 (7th Cir. 2018) ....................................................... 20, 24

*Solo v. United Parcel Serv. Co.*,
  947 F.3d 968 (6th Cir. 2020) ...................................................... *passim*

*Sovak v. Chugai Pharm. Co.*,
  280 F.3d 1266 (9th Cir. 2002) ...........................................................30

*Steward v. Sch. Dist. of Flint*,
  -- N.W.3d --, 2023 WL 3395444 (Mich. Ct. App. May 11, 2023) ................ 5, 45

*Stokes v. Millen Roofing Co.*,
  649 N.W.2d 371 (Mich. 2002) ...........................................................37

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010) ..........................................................................43

*Tobel v. AXA Equitable Live Ins. Co.*,
  No. 298129, 2012 WL 555801 (Mich. Ct. App. Feb. 21, 2012) ........................46

*United States v. Samuels*,
  808 F.2d 1298 (8th Cir. 1987) ...........................................................42

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ..................................................................... 41, 42

*White v. Samsung Elecs. Am., Inc.*,
   61 F.4th 334 (3d Cir. 2023) ........................................................... 23, 24

*Zuckerman Spaeder, LLP v. Auffenberg*,
   646 F.3d 919 (D.C. Cir. 2011) ...................................................... 20, 24

**Statutes**

9 U.S.C. §2 ........................................................................................... 31

9 U.S.C. §3 ............................................................... 17, 31, 32, 33

9 U.S.C. §4 ............................................................................... 17, 31

9 U.S.C. §6 ........................................................................................... 30

**Other Authorities**

AAA, *Employment Arbitration Rules & Mediation Procedures*
   (Nov. 1, 2009), https://bit.ly/3z8FjvZ .................................................. 34

Client Alert*, Fee-Splitting Provisions in Arbitration Agreements
   Subject to Scrutiny*, Crowell & Moring (May 14, 2009),
   https://bit.ly/3xgCPez .................................................................... 38

Charles D. Coleman, *Is Mandatory Arbitration Living Up to Its
   Expectations? A View from the Employer's Perspective*,
   25 ABA.J.Lab.&.Emp.L. 227 (2010) ................................................. 39

Donohue's Standard New Century Dictionary (1925) ............................ 32

Funk & Wagnalls Comprehensive Standard Dictionary (1923) .............. 32

Nelson's New Dictionary (1922) ........................................................... 32

Winston Simplified Dictionary (1919) ................................................... 32

Williston on Contracts (4th ed. 2024) ............................................. 28, 29

Webster's New International Dictionary (1923) ..................................... 32

## INTRODUCTION

This Court routinely holds that employers forfeit their contractual right to arbitrate a lawsuit if they litigate for several months—including filing motions requesting other relief—before seeking to compel arbitration. *See, e.g.*, *Schwebke v. United Wholesale Mortg. LLC*, 96 F.4th 971 (6th Cir. 2024) (nearly seven months and a dispositive motion); *Johnson Assocs. Corp. v. HL Operating Corp.*, 680 F.3d 713 (6th Cir. 2012) (eight months). Here, Defendant Metropolitan Hospital litigated for 13 months before seeking to compel arbitration, filing four motions to dismiss (and a motion to amend one of the motions), two motions to stay discovery, and multiple oppositions to miscellaneous motions filed by Plaintiff Valerie Kloosterman. The hospital's timing smacks of gamesmanship: The hospital mentioned the arbitration clause for the first time shortly after it lost at the motion-to-dismiss stage, and just six days after it participated in a discovery conference. But even if that were the product of an honest oversight, there would be no escaping the conclusion that the hospital acted "inconsistent[ly] with reliance on an arbitration agreement," including by (among other things) filing "a motion to dismiss that s[ought] 'a decision on the merits'" under Rule 12(b)(6). *Solo v. United Parcel Serv. Co.*, 947 F.3d 968, 975 (6th Cir. 2020) (quoting *Hooper v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*, 589 F.3d 917, 922 (8th Cir. 2009)). Ms. Kloosterman's claims should go forward in district court.

The reasons to reverse do not end there.  Even if the hospital had promptly asserted a right to arbitrate, precedent would still entitle Ms. Kloosterman to an Article III forum.  That is not only because the arbitration clause included a cost-splitting provision that circuit precedent prohibits, but also because of the nature of her claims.  For nearly two decades, Ms. Kloosterman worked as a physician assistant in her rural community clinic, earning rave reviews from supervisors and patients alike.  But in 2016, the University of Michigan began acquiring her local healthcare system, and in 2018 began mandating various diversity, equity, and inclusion directives.  One directive in 2021 sought to compel Ms. Kloosterman to affirm various statements about gender identity.  Those statements contradicted both her devout Christian faith and her independent medical judgment on issues subject to scientific debate.  So Ms. Kloosterman sought an accommodation paralleling accommodations previously granted to several colleagues with non-religious preferences about seeing certain patients or prescribing certain treatment modalities.  In response, hospital decisionmakers vilified her as "evil" and a "liar," decreed that she could not take her religious beliefs to work with her, accused her of contributing to transgender suicide rates, and fired her.  At the motion-to-dismiss stage, the district court correctly concluded that, if proven, this conduct violated Ms. Kloosterman's constitutional rights.

2

The hospital responded by seeking to sweep the entire case into confidential arbitration based on an employment agreement that Ms. Kloosterman signed with the predecessor entity. Yet of Ms. Kloosterman's four claims, only one (under Title VII) runs against the hospital. The other three claims (under 42 U.S.C. §1983 and Michigan's state-law equivalent) seek official- and personal-capacity relief from various individuals who did not sign the employment agreement. So if nothing else, the district court should not have shunted those three claims into arbitration alongside the claim against the hospital.

In the end, this case is not about whether courts should "treat[] arbitration contracts like all others." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022). They plainly should. Nor is this case about whether arbitration offers a useful forum to resolve many employment disputes. It plainly does. Instead, the question is whether, after over a year of litigating—and losing—in federal court, one defendant can change horses and force claims against all defendants into arbitration based on an arbitration clause that impermissibly uses cost-shifting to chill potential claims and expressly forbids nonparty enforcement. The answer to that question is no. Anything less than a reversal would flout binding precedent, cleave a 5–1 circuit split, reward defendants for sleeping on their contractual rights, stifle First Amendment activity, and saddle courts with difficult dispositive-motion decisions

3

rendered inconsequential at defendants' discretion.  Ms. Kloosterman's case belongs in federal court.

## JURISDICTIONAL STATEMENT

Ms. Kloosterman seeks relief under 42 U.S.C. §§1983 and 2000e. 2d.Am.Compl., R.69, PageID.1264-77.  So the district court had subject-matter jurisdiction under 28 U.S.C. §1331.  Ms. Kloosterman also seeks relief under Michigan's Elliott-Larsen Civil Rights Act.  *Id.* at PageID.1277-78.  The district court properly exercised supplemental jurisdiction over this claim under 28 U.S.C. §1367(a).  On April 5, 2024, the district court granted defendants' motion for summary judgment, entered a judgment of dismissal, and closed the case.  Opinion, R.79, PageID.1583; Judgment, R.80, PageID.1605.  Ms. Kloosterman filed a timely notice of appeal on May 3, 2024.  Not.Appeal, R.81, PageID.1606.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.    A party to an arbitration agreement forfeits its right to arbitrate if, under the totality of the circumstances, it spends several months acting inconsistent with that right—and especially if it files a 12(b)(6) motion asking the court to engage with the merits.  Here, Metropolitan Hospital spent 13 months litigating multiple 12(b)(6) motions (among other things) and then engaged in a discovery conference, all before invoking the arbitration agreement.  Did the hospital forfeit its right to arbitrate?

2.     This Court refuses to enforce arbitration clauses containing cost-splitting provisions that "would deter a substantial number of similarly situated potential litigants" from bringing Title VII claims in arbitration.  *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 663 (6th Cir. 2003) (en banc).  This Court has also held that a 50–50 cost-split deters potential Title VII claimants making $54,000 annually.  *See id.* at 669-70.  Here, Ms. Kloosterman's annual base salary was $37,807 and the arbitration clause contains a 50–50 cost-splitting provision.  Does the cost-splitting provision make the arbitration clause unenforceable?

3.     Ms. Kloosterman's employment agreement with the hospital did not allow nonparties "to enforce any of the provisions contained [t]herein." 2d.Am.Compl.ex.D, R.69-4, PageID.1305.  The decision below nonetheless allowed the individual defendants to enforce the agreement's arbitration clause under Michigan principal-agent law.  But the individual defendants never made an agency-law argument.  And in all events, Michigan agency law allows agents to invoke their principal's arbitration agreements only when the principal and agents face "indistinguishable" claims—which is not the case here.  *Steward v. Sch. Dist. of Flint*, -- N.W.3d --, 2023 WL 3395444, at *2 (Mich. Ct. App. May 11, 2023).  Should the claims against the individual defendants remain in court?

**STATEMENT OF THE CASE**

**A.    Factual Background**

      **1.    Ms. Kloosterman's 17-Year Career at Metropolitan Hospital**

After obtaining her physician-assistant degree in 2004, Valerie Kloosterman followed in her mother and grandmother's footsteps by taking a job with the Metropolitan Hospital system in western Michigan.    2d.Am.Compl., R.69, PageID.1241.  From 2004 until her 2021 termination, Ms. Kloosterman worked at an outpatient general-practice clinic in Caledonia caring for patients of all ages and backgrounds.  *Id.* at 1241-42.  The hospital does not dispute that she provided exemplary care, consistently earning accolades from supervisors, 2d.Am.Compl.ex.E, R.69-5, PageID.1310-17; admiration from colleagues, 2d.Am.Compl., R.69, PageID.1242, 1252; and affection from patients, including some who grew up seeing Ms. Kloosterman and eventually brought their own children as patients, *id.* at 1242.

During Ms. Kloosterman's 17-year employment with Metropolitan Hospital, and continuing to the present, societal attitudes about gender have shifted in various ways.  But medical science does not necessarily align with these shifts.  Among other things, the medical community has not reached consensus about how best to treat gender dysphoria.  *Id.* at 1260-64.  Likewise, a good-faith debate persists, both in America and abroad, about the safety and efficacy of gender-transition treatment.  *Id.*  Ms. Kloosterman's studied medical judgment teaches that treating gender

dysphoria with puberty-blocking medicine, cross-sex hormone therapy, and gender-transition surgery can precipitate negative outcomes and serious complications, and that no methodologically rigorous long-term study validates whether these treatments' benefits outweigh their risks. *Id.* at 1240, 1261. Ms. Kloosterman's medical judgment also counsels against using biologically incorrect pronouns in medical documentation because doing so might cause patients to miss important screenings tied to biological sex—including things like mammograms or testicular exams to check for sex-specific cancers. *Id.* at 1240, 1261. These views are shared by thousands of medical professionals. *Id.* at 1259.

Ms. Kloosterman treated all patients with respect and to the best of her ability, no matter their sexuality or gender. She is a committed Christian whose vibrant faith follows traditional views on gender, and her faith also demands rigorous adherence to her Hippocratic oath and compassion for all. *Id.* at 1237-40. Consistent with her oath and with her faith, she treated many LGBTQ+ patients during her career. *Id.* at 1242-43; *see also id.* at 1245-46. As she would for any patient, Ms. Kloosterman cared for LGBTQ+ patients professionally and collaboratively: She never used pronouns contradicting a patient's preference (she called transgender patients by their first names), and she never discussed her personal views on gender. *Id.* at 1243. All indications suggest that Ms. Kloosterman's LGBTQ+ patients appreciated the thoughtful and committed care that they received. *Id.* at 1242-43.

## 2.    Ms. Kloosterman's Employment Agreement

Ms. Kloosterman's initial employment agreement lapsed while she stepped away from practice in 2008 to care for her triplets. Kloosterman.Decl.ISO.Pl's.Summ.J.Opp'n, R.76-1, PageID.1518.    After she returned to work part-time in 2009, she signed a new contract setting her base pay at $45 hourly.  2d.Am.Compl.ex.D, R.69-4, PageID.1301.  The contract contained this arbitration clause:

> 28.    **Arbitration**. Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in accordance with the then existing rules of the American Arbitration Association and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The fees and expenses for such arbitration shall be paid equally by the Hospital and the Physician Assistant.

*Id.* at 1305.  The contract also included a severability clause.  *Id.* at 1303.  And the contract further specified that it could be "enforce[d] only by the parties hereto and their successors in interest by virtue of an assignment which is not prohibited under the terms of this Agreement, and no other person shall have the right to enforce any of the provisions contained herein."  *Id.* at 1305.  The contract was signed by Ms. Kloosterman and by the hospital's president (on the hospital's behalf).  *Id.* at 1306.

After more than six years passed, Ms. Kloosterman and the hospital president signed a two-page amendment re-setting her base salary at $37,807 annually.  Pl's.Summ.J.Opp'n.ex.B, R.76-3, PageID.1534.

Just over five years later, in June 2021, the University of Michigan Health-West system completed its takeover of Metropolitan Hospital.  2d.Am.Compl., R.69,

PageID.1243-44.    That same month, Ms. Kloosterman signed a one-page amendment with updates reflecting the new ownership, but saying nothing about arbitration.  Pl's.Summ.J.Opp'n.ex.C, R.76-4, PageID.1537-38.

### 3.    Ms. Kloosterman's Termination

The University of Michigan Health-West's takeover of Metropolitan Hospital brought multiple new initiatives related to diversity, equity, and inclusion (DEI).  Ms. Kloosterman participated in these initiatives, including a training on LGBTQ+ care, without objection.  2d.Am.Compl, R.69, PageID.1244.  But one mandatory online training module in June 2021 required Ms. Kloosterman to pledge agreement with the University of Michigan Health-West's positions on gender.  *Id.* at 1244-45.  Some of those positions conflicted both with her faith and with her studied medical judgment.  *Id.*  So at the suggestion of her supervisors and of HR liaison Catherine Smith, Ms. Kloosterman sought a meeting with the DEI office to request an accommodation excepting her from completing the module.  *Id.* at 1245.

Ms. Kloosterman met with DEI vice-president Rhae-Ann Booker on July 1, 2021 to request a potential accommodation, and Booker agreed to relay the request to HR.  *Id.* at 1245-46.  Throughout Ms. Kloosterman's career, she watched Metropolitan Hospital routinely grant accommodations to colleagues who expressed non-religious preferences regarding various parts of their job.  *Id.* at 1255-56.  For example, a male colleague received an accommodation not to perform pelvic or

breast exams on females, or to prescribe hormones. *Id.* at 1256. The clinic automatically scheduled female patients needing this care with a different provider. *Id.* Likewise, several other colleagues received an accommodation not to prescribe diet pills for weight loss. *Id.* The clinic scheduled patients interested in this treatment with a different provider willing to consult on its benefits and drawbacks. *Id.* Given that context, Ms. Kloosterman hoped that excusing her from the mandatory training module would not pose a problem. *Id.* at 1257.

A few weeks later, Ms. Kloosterman was called into a July 29th meeting with Smith, HR director Marla Cole, and DEI coordinator Thomas Pierce. *Id.* at 1246. Ms. Kloosterman anticipated that the meeting would address her request for an accommodation from the training module. *Id.* But the meeting participants instead seized on whether Ms. Kloosterman would commit in the abstract to using biologically incorrect pronouns in medical documentation and to refer a hypothetical patient for gender-transition surgery. *Id.* When Ms. Kloosterman explained her conscientious religious views and her considered medical judgments counseling against doing so, Pierce turned red and clenched his fists. *Id.* He declared that Ms. Kloosterman had no business bringing her religious beliefs or the Bible to work with her and accused her of abusing her patients and causing them to commit suicide. *Id.* at 1246-47. When Ms. Kloosterman tried to provide additional explanation about her studied medical judgment, he interrupted, calling her "evil" and a "liar," and

10

snapping that he had studies disproving her studies (despite his lack of medical training). *Id.*

After about an hour, Pierce left the room. *Id.* at 1248. Cole encouraged everyone to take a breath, recognized that the meeting had been intense, and adjourned for the day. *Id.* Ms. Kloosterman heard nothing more for several weeks. *Id.*

On August 23, a "touch base" meeting appeared on Ms. Kloosterman's calendar for August 24. *Id.* After Ms. Kloosterman arrived for the meeting, Cole and Smith informed Ms. Kloosterman that she "no longer work[ed] for the University of Michigan" and gave her a termination letter signed by Raki Pai, the University of Michigan Health-West President. *Id.* at 1248-49; *see* 2d.Am.Compl.Ex.F, R.69-6, PageID.1319. Smith commented that although Ms. Kloosterman had already found a "work around" to avoid using biologically incorrect pronouns, it would not save her job. 2d.Am.Compl, R.69, PageID.1249. Cole confiscated Ms. Kloosterman's badge and informed her that she would be notified once her personal effects were boxed up for retrieval. *Id.*

The next morning at 7 AM, Smith announced Ms. Kloosterman's termination at a mandatory staff meeting with other clinic personnel. *Id.* at 1251. A few days after that, Pai and Cole appeared at the clinic in person to answer mounting questions about Ms. Kloosterman's termination. *Id.* Pai intimated that Ms. Kloosterman had

been fired for egregious misconduct—"She had a clear violation"—but he refused to provide any details. *Id.* at 1251-52.

Ten days after the August 24 meeting, the hospital sent a letter signed by Smith memorializing the reasons for Ms. Kloosterman's termination. 2d.Am.Compl.Ex.H, R.69-8, PageID.1323. According to the letter, "the decision to separate [Ms. Kloosterman's] employment was based on [her] refusal to provide respectful evidence-based care to … the LGBTQIA+ population." *Id.* One sentence in the letter claimed that the hospital would not ask Ms. Kloosterman "to personally provide care to a patient that [she] w[as] not comfortable providing, whether that discomfort was due to lack of professional knowledge and experience, or personal, religious, or ethical beliefs." *Id.* But the rest of the letter exposed that as lip service. The hospital fired Ms. Kloosterman because it sought to provide what it deemed to be "an inclusive level of care," and it felt that Ms. Kloosterman's conscientious religious views and her considered medical judgment would "fundamentally alter the nature of th[os]e services." *Id.*

## B.    Procedural Background

After exhausting her administrative remedies, *see* 2d.Am.Compl., R.69, PageID.1236, Ms. Kloosterman sued Metropolitan Hospital, Smith, Booker, Cole, Pierce, and Pai in October 2022. Her complaint brought claims for relief against the individual defendants under §1983, against the hospital under Title VII and state law,

and against all defendants under the Michigan Constitution. Compl., R.1, PageID.29-53.

For the next nine months, defendants engaged in enthusiastic and vigorous motions practice. The same attorneys represented all defendants, but they filed two separate motions to dismiss, one for the individual defendants (R.14, PageID.196), and another for the hospital (R.16, PageID.233). Both motions raised jurisdictional arguments under Rule 12(b)(1) and merits arguments under Rule 12(b)(6). Ten days later, the defense team amended the individual defendants' motion to dismiss (R.23, PageID.333). A few days after that, the defense team moved to stay discovery (R.26, PageID.370). Then, when Ms. Kloosterman filed a first amended complaint (R.32, PageID.511), the defense team moved to dismiss it with new motions raising more jurisdictional and merits arguments (R.34, PageID.637 (individual defendants); R.36, PageID.683 (hospital)). Two days later, the defense team reprised its motion to stay discovery (R.38, PageID.737), which the court granted (R.43, PageID.763). As briefing on defendants' motions to dismiss the first amended complaint unfolded (R.49&55, PageID.780&967 (oppositions); R.64&65, PageID.1084&1105 (replies)), Ms. Kloosterman moved to file a second amended complaint (R.51, PageID.826). The defense team opposed amendment (R.56, PageID.1013) and, when Ms. Kloosterman sought leave to file a reply brief supporting amendment (R.59, PageID.1049), the defense team opposed that too (R.61, PageID.1069). Then,

with hundreds of pages of briefing already in the books, both sides traded dueling notices about supplemental authorities featuring multiple pages of argument (R.66&67, PageID.1123&1184). Nowhere in any of these well-litigated submissions did the defense team say a word about arbitration.

Roughly two months later, in September 2023, the district court issued an order largely denying the defendants' motions to dismiss and allowing several of Ms. Kloosterman's core claims to proceed to discovery (R.68, PageID.1189). The order also analyzed Ms. Kloosterman's motion for leave to amend and directed Ms. Kloosterman to submit an updated second amended complaint reflecting the court's decision. *Id.* at 1225-31. Ms. Kloosterman promptly filed her second amended complaint raising four claims for relief:

1. A free-exercise claim under §1983 against the individual defendants in their official and personal capacities;

2. An equal-protection claim under §1983 against the individual defendants in their official and personal capacities;

3. A religious-discrimination and disparate-treatment claim under Title VII against the hospital; and

4. A state-law civil-rights claim against the individual defendants in their personal capacities.

2d.Am.Compl, R.69, PageID.1264-78.  Eight days later, the parties formally began

discovery by conferring under Rule 26(f).    Toney.Decl.ISO.Pl's.Summ.J.Opp'n,

R.76-6, PageID.1541; *see* Fed. R. Civ. P. 26(d)(1).

Six days after the discovery conference, and over a year into the case, the

defendants filed their "answer … and jury demand" (R.71, PageID.1345).  Mere

hours before filing the answer—as late as 12:59 PM on filing day—the defense team

went back and forth with plaintiff's counsel on an e-mail chain about witness lists,

interrogatories, and privilege logs.  Pl's.Summ.J.Opp'n.ex.E, R.76-7, PageID.1543.

But the answer suddenly contended:  "This Court lacks jurisdiction and otherwise

lacks authority because Plaintiff's claims are barred by the arbitration clause in

Plaintiff's Physician Assistant Employment Agreement and Defendants intend to

seek dismissal upon the same."  Answer, R.71, PageID.1449 (affirmative defense 2

of 26); *see also id.* at PageID.1351-52 (averring "that this action is subject to

arbitration").   The answer marked the first time anyone from the defense team

mentioned anything about arbitration.

Eight days later, defendants filed a "motion for summary judgment to compel

arbitration."  R.73, PageID.1456.  Neither the motion nor the accompanying brief

(R.74, PageID.1458) explained why defendants waited 13 months and more than 70

docket entries to seek this relief.  Nonetheless, the district court granted the motion

and closed the case.  Order, R.79, PageID.1583; Judgment, R.80, Page ID.1605.  Ms. Kloosterman appeals.

## STANDARD OF REVIEW

This Court reviews decisions compelling arbitration de novo.  *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 836 (6th Cir. 2021).

## SUMMARY OF THE ARGUMENT

**I.**    Binding precedent makes this an exceptionally easy case.  Under a trio of recent Sixth Circuit cases, an employer who acts inconsistently with a contractual arbitration right forfeits that right—even if the employer did not originally know about the arbitration clause (although here the hospital has provided nothing to rebut the presumption that it knew about the clause all along).  That precedent fits this case to a T:  It is hard to act more inconsistently with an arbitration right than by spending a full year filing and litigating multiple 12(b)(6) motions and then invoking an arbitration clause for the first time ever only after losing the 12(b)(6) motions in substantial part—and mere hours after continuing to work with opposing counsel on discovery plans, no less.

The decision below ducks this caselaw, instead latching onto *Morgan v. Sundance* and (over)reading it to require express waiver of arbitration rights.  But *Morgan* actually said the opposite:  The Federal Arbitration Act (FAA) "does not" "authorize[] federal courts to create … arbitration-specific procedural rule[s]."  596

U.S. at 414.  And hornbook contract law teaches that parties can forfeit contractual rights through inconsistent conduct.  So properly understood, *Morgan* buttresses the conclusion that the hospital forfeited its rights through inconsistent conduct.

The FAA's text and courts' longstanding understanding of it reinforce that conclusion.  Section 3 requires courts to stay litigation pending arbitration as long as "the applicant for the stay is not in default with … arbitration."  9 U.S.C. §3.  The very next section makes clear that a party is "in default" with arbitration if the party "fail[s], neglect[s], or refus[es] … to arbitrate under a written agreement"—in other words, if the party sleeps on its right.  *Id.* §4.  And contemporaneous caselaw confirms that §3's "in default" proviso "provide[s] that the party seeking to enforce arbitration can do so only when not guilty of dilatoriness or delay."  *Radiator Specialty Co. v. Cannon Mills, Inc.*, 97 F.2d 318, 319 (4th Cir. 1938).  Because the hospital is guilty of both here, its belated attempt to invoke arbitration fails.

**II.**    Even if the hospital could get around its forfeiture, the decision below flouts *Morrison v. Circuit City Stores, Inc.*  There, the en banc Court held that an arbitration agreement splitting costs 50–50 between the parties denied a former employee an effective forum to vindicate her Title VII rights because she made only $54,000 annually.  The arbitration clause at issue here also includes a 50–50 cost-splitting provision, and Ms. Kloosterman's base salary was even less than what the *Morrison* plaintiff made.  So under binding precedent, the arbitration clause's cost-

17

splitting provision is unenforceable.  And that unenforceable provision stymies the entire arbitration clause:  Although the employment agreement contains a severability clause, the cost-splitting provision is inextricably bound with the rest of the arbitration clause and is thus non-severable.

**III.**    Last but certainly not least, the district court improperly sent Ms. Kloosterman's claims against the individual defendants to arbitration.  The individual defendants were not parties to Ms. Kloosterman's employment agreement, which explicitly states that it "shall be enforceable only by the parties hereto … and no other person shall have the right to enforce any of the provisions contained herein."  2d.Am.Compl.ex.D, R.69-4, PageID.1305.  That should have ended the matter.

The district court concluded that the individual defendants could nonetheless enforce the arbitration clause under state-law agency principles drawn from *Altobelli v. Hartmann*, 884 N.W.2d 537 (Mich. 2016).  But none of that appeared in either side's briefs—not a single cite to *Altobelli*, not any other state-law discussion, and certainly not any argument that the individual defendants acted as the hospital's agents in calling Ms. Kloosterman evil, decreeing that she could not take the Bible to work with her, claiming that she contributed to transgender suicide rates, and casting aspersions about her to her former colleagues.  So the Court can and should reverse on party-presentation grounds alone.

But as often happens when courts reach out to resolve issues that the parties did not brief or argue, the district court also got it wrong. At the outset, Michigan law on nonparty enforcement does not even apply here because the agreement between Ms. Kloosterman and the hospital expressly bars nonparty enforcement, full stop. And even if Michigan law has some role to play, it would not permit nonparty enforcement. Although nonparties may be able to enforce an arbitration clause against a party when the party brings materially identical claims against a counterparty, Ms. Kloosterman's claims against the individual defendants diverge sharply from her claims against the hospital. So at bare minimum, Ms. Kloosterman's claims against the individual defendants belong in federal court.

## ARGUMENT

## I.    The Hospital Forfeited Its Right To Arbitrate.

The hospital forfeited its right to arbitrate by waiting to invoke it until after 13 months of eager and aggressive motions practice, culminating in a 12(b)(6) partial loss, and followed with ungrudging participation in a 26(f) conference. As precedent, text, and longstanding practice confirm, the hospital waited too long.

### A.    This Court's Caselaw Confirms that the Hospital Forfeited Any Right to Arbitrate by Acting Inconsistently With the Right.

1.    Three Sixth Circuit cases over the past 14 years confirm that, when a defendant-employer "kn[o]w[s] or should have known" that a former employee signed an arbitration clause, but the employer intentionally "pursu[es] … legal

19

victory based on the merits" with (for example) a 12(b)(6) motion, the employer forfeits the ability to later invoke the arbitration clause. *Solo*, 947 F.3d at 976. In each case, the defendant-employer—like the hospital here—drug its feet for several months of litigation before seeking to force a former employee's suit into arbitration. Because that foot-dragging is wholly inconsistent with demanding arbitration, this Court deemed the right to arbitrate forfeited (i.e., implicitly waived).[1]

Start with *Schwebke v. United Wholesale Mortgage LLC*. There, the defendant-employer "fail[ed] to raise arbitration" in its answer and during "six-and-a-half months" of "extensive discovery" due to an oversight. 96 F.4th at 973, 976. But oversight or not, the Court held that the defendant-employer "implicitly waived its right to compel arbitration because its conduct was completely inconsistent with reliance on its arbitration right." *Id.* at 977.

Next take *Johnson Associates Corp. v. HL Operating Corp.*, which *Schwebke* described as "very similar." 96 F.4th at 975 (citing 680 F.3d 713). That defendant-

---

[1] Although many cases refer to "the concept" of "waiver" to assess "both intentional relinquishments and implicit abandonments of the right" to arbitration, *Smith v. GC Servs. Ltd. P'ship*, 907 F.3d 495, 498-99 (7th Cir. 2018), *e.g.*, *Rankin v. Allstate Ins. Co.*, 336 F.3d 8, 12 (1st Cir. 2003), Ms. Kloosterman follows several courts' lead in using the term "forfeiture" to assess whether "a party's litigation conduct results in the loss of a contractual right to arbitrate," *Morgan*, 596 U.S. at 416. *See, e.g.*, *Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919, 922 (D.C. Cir. 2011) ("[T]o be technically correct as well as clear … forfeiture, not waiver, is the appropriate standard for evaluating a late-filed motion" to compel arbitration); *see also Schwebke*, 96 F.4th at 974 n.1 (reserving the question).

employer waited eight months until the precipice of discovery—the parties had conferred and served requests, but "no discovery responses had been exchanged and no depositions had been taken"—before springing the arbitration clause on the plaintiff-employee.  No. 3:09-1206, 2010 WL 4942788, at *1 (M.D. Tenn. Nov. 30, 2010).  Although that "case involved less litigation" than other cases finding forfeiture, the Court nonetheless concluded that failing to mention arbitration in the answer, filing a counterclaim, and "participating in only a 'minimal' amount of litigation" "[]sufficient[ly] … show[ed] that [the defendant-employer] acted completely inconsistently with its right to arbitration … when considered together." 680 F.3d at 718-19.

Last but not least, consider *Solo v. United Parcel Service Co.*  There, the Court joined at least six other circuits in holding that "a motion to dismiss that seeks 'a decision on the merits' and 'an immediate and total victory in the parties' dispute' is entirely inconsistent with later requesting that those same merits questions be resolved in arbitration."  947 F.3d at 975-76 (quoting *Hooper*, 589 F.3d at 922); *see also infra* pp.23-24 (collecting cases).  That rule applies even when—unlike here—the motion to dismiss expressly reserves the arbitration right:  "A party may not use a motion to dismiss 'to see how the case [is] going in federal district court,' while holding arbitration in reserve for 'a second chance in another forum.'"  *Id.* at 975 (second alteration in original, citation omitted) (quoting *Hooper*, 589 F.3d at 922,

and *Hurley v. Deutsche Bank Tr. Co. Ams.*, 610 F.3d 334, 339 (6th Cir. 2010), respectively).  In effect, deciding "whether [a] dispute should be resolved via arbitration" must "precede[] the merits," because "the benefits of 'efficient and speedy' arbitration are lost if a party seeks arbitration only after insisting upon court process." *Id.* at 972, 975 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).[2]

These recent cases do not stand alone.  In fact, since at least 1950, the Court has recognized the principle that a defendant forfeits its arbitration right if it does not "decide[] … within a reasonable period of time []after" receiving a complaint "which of the two methods of procedure it would elect to follow, either insist on its contract right of arbitration" or "actively participate[] in [the] law suit as a defendant anticipating court" resolution.  *Am. Locomotive Co. v. Gyro Process Co.*, 185 F.2d 316, 320 (6th Cir. 1950); *see also, e.g.*, *Hurley*, 610 F.3d at 338-39 (finding forfeiture

---

[2] The Court's unpublished opinion in *Gunn v. NPC International, Inc.* is more emphatic yet.  That defendant-employer, like the hospital here, "waited almost fifteen months before raising the arbitration issue," after "participat[ing] in a scheduling conference … and fil[ing] several motions (some dispositive) without ever mentioning the arbitration agreement."  625 F. App'x 261, 264-65 (6th Cir. 2015).  Judge McKeague reasoned that, beyond being "completely inconsistent with reliance on an arbitration agreement," moving to "compel arbitration" "only after … obtain[ing] an unfavorable ruling on its initial dispositive motions" constitutes "a factor weighing in favor of finding waiver, for it suggests that [the employer's] delay, instead of being attributable to an innocent or otherwise excusable purpose, was deliberately motivated by some perceived tactical advantage."  *Id.* at 263-65 (finding waiver even though no discovery had been conducted).

because "Defendants have consistently and actively litigated this action in court …
not only respond[ing] to actions taken by Plaintiffs, but … fil[ing] multiple
dispositive and non-dispositive motions of their own"); *O.J. Distrib., Inc. v. Hornell
Brewing Co.*, 340 F.3d 345, 358 (6th Cir. 2003) (finding forfeiture because
"Defendant slept on its rights for approximately fifteen months"); *Gen. Star Nat'l
Ins. Co. v. Administratia Asigurarilor de Stat*, 289 F.3d 434, 438 (6th Cir. 2002)
(finding forfeiture because defendants knew about the lawsuit for seventeen months
but sought to invoke arbitration only after the district court entered a default
judgment); *cf. Shy v. Navistar Int'l Corp.*, 781 F.3d 820, 829-30 (6th Cir. 2020)
(finding no forfeiture when a defendant sought arbitration "in its second substantive
submission in the litigation").

This Circuit does not stand alone, either.  In a Fifth Circuit case presenting a
nearly identical procedural history—the defendant invoked arbitration "thirteen
months" into the case, several weeks after losing a 12(b)(6) motion and "four days
after attending a Rule 26(f) conference"—the court found forfeiture because the
"action of moving to dismiss … with no mention of compelling arbitration
demonstrated a desire to resolve the dispute in litigation rather than arbitration."
*Forby v. One Techs., L.P.*, 909 F.3d 780, 783-85 (5th Cir. 2018).  The Third, Seventh,
Eighth, and Ninth Circuits likewise find forfeiture when a defendant "pursue[s]
motions to dismiss on the merits" because, although "motions to dismiss" "on

procedural grounds" "will not always evince an intent to litigate instead of arbitrate," *White v. Samsung Elecs. Am., Inc.*, 61 F.4th 334, 340 & n.27 (3d Cir. 2023), "seeking a determination that the plaintiff's legal theory does not state a claim is evidence of" forfeiture, *Smith*, 907 F.3d at 501, especially when the defendant "receive[s] an adverse ruling before moving to compel arbitration," *Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1015-16 (9th Cir. 2023). *See also Hooper*, 589 F.3d at 921-22. And the D.C. Circuit has gone even farther, holding that "failure to invoke arbitration at the first available opportunity will presumptively extinguish a client's ability later to opt for arbitration." *Zuckerman*, 646 F.3d at 924.

2.     Under a straightforward application of *Schwebke*, *Johnson*, and *Solo*, the hospital engaged in more than enough conduct inconsistent with arbitration to forfeit any right to arbitrate. Besides opposing Ms. Kloosterman's requests for relief and conferring about discovery "without protest or reference to the arbitration clause," *Schwebke*, 96 F.4th at 975, the hospital made multiple "affirmative request[s] for relief," including "filing" multiple "dispositive motion[s]" "thoroughly enmeshed in the merits" and "s[eeking] dismissal of all claims," *Solo*, 947 F.3d at 975.

True, this case does not involve the "extensive discovery" present in *Schwebke*. 96 F.4th at 973. And unlike the *Johnson* employer, the hospital at least finally raised arbitration for the first time in its answer. *Cf.* 680 F.3d at 718-19. But as distinctions go, those fall flat. *Schwebke* itself diminished the significance of

extensive discovery by describing *Johnson* (where no discovery responses had been exchanged) as "very similar." 96 F.4th at 975. As for listing arbitration as an affirmative defense, Rule 8(c) compels a defendant to do so, *see Manasher v. NECC Telecom*, 310 F. App'x 804, 806 n.3 (6th Cir. 2009), and *Schwebke* notes that compulsory conduct "is less relevant to the analysis than" "a dispositive motion affirmatively ask[ing] the district court to exercise power and decide an issue," 96 F.4th at 976. *See also McCoy v. Walmart, Inc.*, 13 F.4th 702, 704-05 (8th Cir. 2021) (finding forfeiture even though the defendant "eventually decided" after fifteen months "to list arbitration as a potential defense in its amended answer"). And listing arbitration as an affirmative defense carries even less weight when, as here, the same answer includes a "jury demand" and twenty-five other affirmative defenses. R.71, PageID.1345. Put simply, the strongest signal of an intent to litigate comes not from responsive conduct like compulsory defenses, counterclaims, or discovery preserving rights and "attempt[ing] to meet all issues raised in litigation." *Germany v. River Terminal Ry. Co.*, 477 F.2d 546, 547 (6th Cir. 1973). Rather, the strongest signal comes from asking the Court to pass on the merits, which is what the hospital did here with multiple 12(b)(6) motions.

In all events, the forfeiture "analysis rests on the totality of the circumstances—not on any bright-line rule." *Schwebke*, 96 F.4th at 976. Here, the circumstances point overwhelmingly towards forfeiture. *Solo* alone should end the

matter, given its holding that filing a 12(b)(6) motion is the strongest possible indicator of forfeiture, outweighing even a purported attempt to reserve the arbitration right. *See* 947 F.3d at 975-76. Not only did the hospital file multiple 12(b)(6) motions here, but the motions did not even mention arbitration. So *Solo* applies with conclusive force. And if any doubt remains, *Schwebke* and *Johnson* settle it. This case features a longer pre-arbitration pendency than those cases, plus a more extensive pre-arbitration motions practice—including an opposed "motion to amend the complaint," which as *Johnson* notes, signals a "significant" intent to litigate. 680 F.3d at 718.

This case also features a circumstance not present in *Schwebke*, *Johnson*, or *Solo*: the hospital's private posturing about the parties' 26(f) plan mere hours before invoking the arbitration clause. As this Court has noted, "[m]eeting with plaintiffs' counsel and then filing with the district court a joint report under Civil Rule 26(f)" constitutes "voluntary, active, and extensive participation in the litigation indisputably g[i]v[ing] plaintiffs a 'reasonable expectation that [the defendant will] defend the suit on the merits.'" *King v. Taylor*, 694 F.3d 650, 660 (6th Cir. 2012) (quoting *Gerber v. Riordan*, 649 F.3d 514, 519 (6th Cir. 2011))). Here, defense counsel was more than "happy to get a Rule 26 conference on the schedule," signing-off on (and even offering to file) a joint 26(f) report. Pl's.Summ.J.Opp'n.ex.E, R.76-

7, PageID.1543, 1547.  That conduct throws the hospital's forfeiture into even starker relief.

In short, it is hard to express more of an intent to litigate than by spending a year filing various motions and seeking to arbitrate only after losing multiple 12(b)(6) motions—and only after coordinating with opposing counsel about detailed discovery plans to boot.  Under the law of this Circuit (and at least six others, *see supra* pp.23-24) the hospital forfeited its arbitration right.

3.    The decision below engaged with none of this caselaw.  The decision did not even cite *Johnson* or *Solo*, and it waved away *Schwebke* with zero analysis.  *See* Order, R.79, PageID.1593.  Instead, the decision suggested that a recent Supreme Court opinion, *Morgan v. Sundance*, replaced this Court's objective test focusing on a defendant's conduct to assess whether it forfeited its arbitration right with a subjective standard from the criminal-law context requiring "an intentional relinquishment or abandonment of a known right."  *Id.* at 1592-93.  *Morgan* did no such thing.

*Morgan* answered one—and only one—question:  whether the federal "policy favoring arbitration" requires courts to assess arbitration "waiver or forfeiture or what-have-you" through the lens of whether the movant's conduct prejudiced the nonmovant, even if whatever contract law a court is applying does not require prejudice to find waiver or forfeiture.  596 U.S. at 413-14, 418.  The Court answered

27

that question in the negative, clarifying that "[t]he federal policy is about treating arbitration contracts like all others, not about fostering arbitration," and confirming that "federal courts [may not] invent special, arbitration-preferring procedural rules." *Id.* at 418. But the Court did not purport to hold that the only way a party can waive or forfeit its arbitration right is through an intentional relinquishment or abandonment. To the contrary, the Court expressly invited lower courts to continue assessing belated efforts to invoke arbitration through traditional "rules of … forfeiture, estoppel, laches, or procedural timeliness," many of which focus on conduct, not just expressed intentions. *Id.* at 416; *see also supra* note 1. And *Schwebke* confirms post-*Morgan* that defendant-employers can either waive contractual rights expressly through words or forfeit them "implicitly" through conduct. 96 F.4th at 977; *see also In re Pawn Am. Consumer Data Breach Litig.*, --- F.4th ---, 2024 WL 3366702, at *2 (8th Cir. 2024) (same).

*Morgan* thus supports Ms. Kloosterman, not the hospital. Again, *Morgan* reaffirms that "'arbitration agreements [are] as enforceable as other contracts, but not more,'" so "a court may not devise novel rules to favor arbitration over litigation." 596 U.S. at 418 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). Yet cabining arbitration waiver to a crabbed sense of express waiver transplanted from the criminal law would do just that: "Generally, an implied waiver"—i.e., forfeiture—"will be established" under

standard contract law "when the party to be benefited 'does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement.'"  13 Williston on Contracts §39:30 (4th ed. 2024); *accord Sandler v. All Acquisition Corp., Inc.*, 954 F.2d 382, 385 (6th Cir. 1992).  So because standard contract law recognizes forfeiture through action, requiring express waiver for arbitration clauses would effectively craft a heightened, "bespoke rule of waiver for arbitration"—exactly what *Morgan* forbids.  596 U.S. at 417.

And even beyond *Morgan*, the decision below ill-fits the Supreme Court's FAA caselaw writ large.  Without courts policing forfeiture, arbitration's *raison d'être*—"the promise of quicker, more informal, and often cheaper resolutions for everyone involved"—collapses.  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505 (2018).  This case aptly illustrates the point.  Despite initially consenting to "streamlined proceedings and expeditious results," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633 (1985), the hospital took over a year to "weigh its options" and "see how the case was going in federal district court before deciding whether it would be better off there or in arbitration," *Cabinetree of Wis., Inc. v. Kraftmaid Cabinetry, Inc.*, 50 F.3d 388, 391 (7th Cir. 1995).  Then, by requiring Ms. Kloosterman to prove intentional waiver, the decision below effectively gifted the hospital a mulligan.  But that mulligan only makes resolution less efficient, less expeditious, and less economical.

A rule enabling one side to play "heads I win, tails you lose" with arbitration agreements has nothing to recommend it.  *Id.*  To preserve arbitration as a viable alternative to litigation, courts must wield ordinary forfeiture principles when a rare bad apple seeks to "play[]" "outcome-oriented gamesmanship … on the court and the opposing party's dime."  *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018).  Finding forfeiture in such cases furthers arbitration's purpose; forgiving forfeiture frustrates it.[3]

### B.  The Text and Historical Construction of the FAA Confirm that the Hospital Forfeited Any Arbitration Right.

The FAA's text and longstanding judicial understandings of it reinforce the conclusion that the hospital forfeited any right to arbitrate.  Although Congress passed the FAA "in 1925 in response to widespread judicial hostility to arbitration

---

[3] To the extent the decision below suggests that Michigan law controls the forfeiture inquiry, or that Michigan law requires affirmative waiver, it is wrong on both fronts.  *Cf.* Order, R.79, PageID.1588-89, 1591-92.  For starters, this Circuit (and every other) applies federal common law to FAA-waiver questions.  *E.g.*, *Schwebke*, 96 F.4th at 976; *see Marie v. Allied Home Mortg. Corp.*, 402 F.3d 1, 11-14 (1st Cir. 2005); *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456 n.12 (2d Cir. 1995); *see also* 9 U.S.C. §6.  What is more, "Michigan law plainly recognizes a waiver of arbitration by participation in judicial proceedings such as filing motions."  *See Madison Dist. Pub. Schs. v. Myers*, 637 N.W.2d 526, 600-01 (Mich. Ct. App. 2001) ("We will not sanction [a party]'s utilization of the court system, with its scarce resources, merely to test the judicial waters until it received an unfavorable ruling, and its untimely demand for arbitration after more than 1 ½ years in litigation. 'The purpose of arbitration is to avoid protracted litigation.'" (citation omitted) (quoting *NuVision v. Dunscombe*, 415 N.W.2d 234, 238 (Mich. Ct. App. 1987))).

agreements," Congress incorporated common-law contract waiver and forfeiture principles. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). So the statute's text, as understood both then and today, confirms that a party forfeits its contractual arbitration right when the party displays "dilatoriness or delay" in asserting it—as the hospital did here. *Radiator Specialty Co.*, 97 F.2d at 319.

Section 2, the FAA's "primary substantive provision," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), commands that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. §2. Sections 3 and 4 in turn give §2 its teeth. First, §3 requires that, when a dispute that should go to arbitration instead comes to court, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, *providing the applicant for the stay is not in default in proceeding with such arbitration*." *Id.* §3 (emphasis added). Next, §4 gives district courts jurisdiction to hear petitions from "part[ies] aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" and seeking "an order directing that such arbitration proceed in the manner provided for in such agreement." *Id.* §4. Section 4 also requires that "[f]ive days' notice in writing of such application shall be served upon the party *in default*." *Id.* (emphasis added).

31

Section 4's plain text thus confirms that a party is "in default" of an arbitration agreement when it "fail[s], neglect[s], or refus[es]" to abide by the agreement.[4]  And with this meaning at hand, §3's upshot could not be clearer:  A party cannot seek to force its adversary into arbitration if the party itself "fail[ed], neglect[ed], or refus[ed]" to invoke the arbitration agreement promptly.  *See Azar v. Allina Health Servs.*, 587 U.S. 566, 576 (2019) ("when Congress uses a term in multiple places within a single statute, the term bears a consistent meaning throughout").

Cases from the FAA's enactment period reinforce §3's use-it-or-lose-it pedigree.  In one 1938 case, a defendant litigated for a year, including requesting a continuance and filing other motions "expressly invok[ing] [the court's] jurisdiction" by seeking relief.  *Radiator Specialty Co.*, 97 F.2d at 319.  The Fourth Circuit held that the defendant "[b]y its course … waived its right under the arbitration clause … and was in default in proceeding with arbitration."  *Id.*  The court explained that a defendant who "intend[s] to rely on [an] arbitration clause" has a "duty" to "immediately … assert its intention to enforce" the clause.  *Id.*  And

---

[4] Historical dictionaries agree.  *See, e.g.*, *Default*, Donohue's Standard New Century Dictionary 80 (1925) ("An omission"); *Default*, Webster's New International Dictionary 584 (1923) ("A failing or failure; omission of that which ought to be done; neglect to do what duty or law requires."); *Default*, Nelson's New Dictionary 108 (1922) ("a failing to do; to fail in duty"); *Default*, Funk & Wagnalls Comprehensive Standard Dictionary 169 (1923) ("neglect" or "failure to appear or plead in a suit"); *In default of*, The Winston Simplified Dictionary 161 (1919) ("to make a failure in, as a payment, an appearance in court, etc.").

using words landing with equal force today, the Fourth Circuit observed that the FAA "was never intended" to be used "as a means of furthering and extending delays"; under §3, "the party seeking to enforce arbitration can do so only when not guilty of dilatoriness or delay." *Id.*; *see also La Nacional Platanera, S.C.L. v. N. Am. Fruit & S.S. Corp.*, 84 F.2d 881, 882-83 (5th Cir. 1936) (expressing "no hesitancy in deciding that" a party who "proceed[s] in a very leisurely manner" before "attempting to invoke arbitration" is "so much in default that he was not entitled to demand arbitration"). In other words, under the FAA's original meaning, "[c]ommencement of a suit in court rather than reliance upon arbitration, with answer by the opposing party upon the merits, is a waiver of the right to arbitrate by both parties." *Galion Iron Works & Mfg. Co. v. J.D. Adams Mfg. Co.*, 128 F.2d 411, 413 (7th Cir. 1942).

The hospital's conduct cannot be squared with this long-settled understanding. Like the Fourth Circuit defendant 86 years ago, the hospital invoked its arbitration right only after considerable delay; contravening the statutory text, the hospital elided the arbitration clause for months, through failure or neglect. In either event, the hospital waited too long.

## II.  The Arbitration Clause's Cost-Splitting Provision Renders It Unenforceable.

Even setting aside the hospital's forfeiture, its belated attempt to invoke the arbitration clause fails for an independent reason: the hospital's decision to override the American Arbitration Association's (AAA) default employer-pays rule with a

50–50 cost-split. The arbitration clause at issue generally adopted the AAA's rules wholesale: "Any controversy, dispute, or claim arising out of or related to this Agreement, or the breach thereof, shall be settled in accordance with the then existing rules of the American Arbitration Association." *Supra* p.8. But when Ms. Kloosterman and the hospital signed the underlying agreement, the AAA capped an employee's filing fee at $150 and required the employer to bear all hearing fees, arbitrator-compensation costs, room-rental charges, and all other expenses. *See* AAA, *Employment Arbitration Rules & Mediation Procedures* 23-24 (Nov. 1, 2009), https://bit.ly/3z8FjvZ. Evidently unwilling to arbitrate under that condition, the hospital tried to contract around it, inserting into the agreement a provision stating that "[t]he fees and expenses for such arbitration shall be paid equally by the hospital and the physician assistant." *Supra* p.8.

Although the hospital's desire to avoid arbitration costs is understandable, the law of this Circuit is clear: A 50–50 cost-splitting provision is unenforceable against former employees making less than $54,000 a year. And logic suggests that the cost-splitting provision bore significant weight in the hospital's attempt to belatedly shift to arbitration here. Because the cost-splitting provision thus cannot be severed, the entire arbitration clause falls.

34

### A.    *Morrison* Renders the Cost-Splitting Provision Unenforceable.

The hospital's intentional choice to slash the AAA's default employer-pays rule in favor of a 50–50 cost-split smacks up against *Morrison v. Circuit City Stores*. Six years before the hospital wrote this agreement, the en banc Court recognized what has become known as the "effective vindication" principle:  Because Congress passed Title VII after it passed the FAA, cost-splitting provisions in arbitration clauses are invalid when "filing and administrative fees attached to arbitration … are so high as to make" vindicating Title VII rights "impracticable." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 235-36 (2013).   Respecting this principle, *Morrison* directs district courts to consider whether individuals "similarly situated" to the plaintiff could "shoulder the costs of arbitration."  317 F.3d at 659, 663-64.  If "the terms of the arbitration agreement … would deter a substantial number of similarly situated employees from bringing their claims in the arbitral forum," then the employee's Title VII claims "cannot be subject to mandatory arbitration under that agreement."  *Id.* at 658, 664-65.

*Morrison* set sensible limits on its rule, ensuring that the effective-vindication principle remains a narrow exception to the FAA's general enforcement mandate. For instance, the Court cautioned that in cases involving "high-level managerial employees and others with substantial means," cost-splitting provisions should pose no hurdle to enforcing an arbitration clause.  317 F.3d at 665; *see, e.g.*, *Imbrunone v.*

*Sch. Dist. of Hamtramck*, No. 22-12346, 2023 WL 5489022, at *6 (E.D. Mich. Aug 24, 2023) (enforcing agreement with fee-splitting provision against plaintiff making $100,000 annually).  But *Morrison* identified at least one arbitration clause falling within its ambit.  The en banc Court held that a 50–50 cost-splitting provision would chill "a substantial percentage of potential" Title VII plaintiffs making less than $54,000 annually "from bringing their claims in the arbitral forum."  *Id.* at 669.  So under circuit law, for plaintiffs meeting that description, 50–50 cost-splitting provisions are unenforceable.  *See, e.g.*, *Champness v. J.D. Byrider Sys., LLC*, No. 14-730, 2015 WL 247924, at *5-7 (S.D. Ohio Jan. 20, 2015) (invalidating fee-splitting provision for plaintiff making $36,000 annually).

This case fits *Morrison*'s narrow mold.  "In [an] arbitral forum," Ms. Kloosterman and similarly situated Title VII plaintiffs "face[] an additional expense" that they would "never incur[] in [a] judicial forum": "'[P]ay[ing] for the services of the judge assigned to hear her or his case'" in order to pursue a statutory right conferred by Congress. *Morrison*, 317 F.3d at 664 (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1484 (D.C. Cir. 1997)).  That anomalous result—unheard of "in American jurisprudence"—would render Title VII rights a dead-letter for plaintiffs in Ms. Kloosterman's shoes unless they were able to front a significant (and uncertain) portion of their annual earnings.  *Id.* (quoting *Cole*, 105 F.3d at 1484); *see also* Kloosterman.Decl.ISO.Pl's.Summ.J.Opp'n, R.76-1, PageID.1519

(Ms. Kloosterman noting that "[i]f [she] had known that arbitration was [her] only option rather than going to court, that would probably have deterred [her] from seeking a claim at all" because her "family" could not have "afford[ed]" "to split [arbitration] costs with [the] Hospital, especially since we would not know in advance what the costs would be"). That is exactly when *Morrison* makes "the arbitration agreement, or, at minimum, the cost-splitting provision contained within it, … unenforceable." 317 F.3d at 659.

### B.    The Cost-Splitting Provision Cannot Be Severed.

Here, the cost-splitting provision sunders the entire arbitration clause. Although the broader employment agreement includes a severability clause, *Morrison* itself acknowledges that a severability clause does not answer the remedial inquiry. *See id.* at 675. Rather, the answer comes from Michigan contract law. *See id.* at 666. And in Michigan, "in order to sever 'the illegal portion'" from a contract, "'the illegal provision must not be central to the parties' agreement.'" *AFSCME v. City of Detroit*, 704 N.W.2d 712, 716 (Mich. Ct. App. 2005) (quoting *Stokes v. Millen Roofing Co.*, 649 N.W.2d 371, 374 (Mich. 2002)). In essence, the arbitration clause "can be bifurcated only if the agreement to" split costs was "independent of the agreement to" arbitrate in the first place. *Stokes*, 649 N.W.2d at 374-75.

There are strong reasons to doubt that the hospital would have consented to this arbitration agreement without the cost-splitting provision. For one thing, "the

intent of the contracting parties is best discerned by the language" of the arbitration provision. *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 n.21 (Mich. 2005). And here, the hospital's language suggests that cost-splitting was a deal-breaker: The arbitration provision blanketly incorporated all AAA rules *except* for the rule about who pays.

Historical context underscores that the carve-out was deliberate. When the hospital wrote the agreement, leading law firms publicly warned about "the pitfalls of including a fee-sharing provision in arbitration agreements in the employment context" and generally counseled "employers [to] beware of any such fee-sharing provisions which likely will be viewed with skepticism, especially when challenged by employees who … arguably do not have sufficient income to share the arbitration costs." Client Alert*, Fee-Splitting Provisions in Arbitration Agreements Subject to Scrutiny*, Crowell & Moring (May 14, 2009), https://bit.ly/3xgCPez. Simply put, if cost-splitting did not matter a great deal to the hospital, then there would have been no reason to swim against this daunting anti-cost-splitting current.

Doctrine explains why the hospital would have insisted ex ante on going Dutch in arbitration here. Having racked up substantial attorneys' fees at the motion-to-dismiss stage, the hospital's primary benefit from seeking arbitration now is avoiding expensive discovery costs. But the hospital cannot actually avoid those costs: The district court has held that Ms. Kloosterman states valid claims for relief

under §1983, and an arbitration decision does "*not* receive preclusive effect in any subsequent §1983 action." *Bromley v. Mich. Educ. Ass'n*, 82 F.3d 686, 692-93 (6th Cir. 1996) (quoting *Chi. Teachers Union v. Hudson*, 475 U.S. 292, 308 n.21 (1986)). So even if the hospital prevails in arbitration, it may well end up back in discovery no matter what. And without the cost-splitting provision, the hospital is not even getting a deal on arbitration—it is paying full freight.

It makes some sense to insist on arbitration when you are only paying for half of it, and when you know it will resolve the dispute. It makes far less sense to insist on arbitration when you have to pay the whole tab, and when—even if you prevail— you might well end up right back in discovery. And arbitration becomes even less attractive once you account for "the limited ability to obtain summary judgment and other dispositive motion relief in arbitration, and the narrow grounds for appeal in the event of an adverse arbitration award." Charles D. Coleman, *Is Mandatory Arbitration Living Up to Its Expectations? A View from the Employer's Perspective*, 25 ABA.J.Lab.&.Emp.L. 227, 227, 229, 233 (2010) (explaining that "[m]any employers are realizing that mandatory arbitration may not be the right path to resolving employment disputes because it may be just as expensive and take almost as long as the congested and costly toll road of litigation").

In such circumstances, it is hard to argue that the cost-splitting provision was not material to the hospital's decision to include the arbitration clause. And because

"[t]he primary consideration in determining whether a contractual provision is severable is the intent of the parties," it follows that the cost-splitting provision is not severable here. *Prof'l Rehab. Assocs. v. State Farm Mut. Auto. Ins. Co.*, 577 N.W.2d 909, 913 (Mich. Ct. App. 1998).

## III.    Claims Against The Individual Defendants Belong In Federal Court.

Even assuming the hospital could belatedly invoke the arbitration agreement, the district court erred by sending the claims against the individual defendants to arbitration too. The individual defendants never made the principal-agent argument that the district court embraced, and for good reason: It is doubly wrong as a matter of law. This Court should reverse, either under party-presentation principles or on the merits.

### A.    The District Court Erred by Embracing an Argument that the Individual Defendants Never Made.

Because the individual defendants are not parties to the arbitration agreement, they conceded that Michigan law would allow them to invoke the agreement only if they faced "claims … identical to those against the" hospital. Defs'.Br.ISO.Summ.J., R.74, PageID.1467 (quoting *Powell v. Sparrow Hosp.*, No. 10-206, 2010 WL 2901875, at *4 (W.D. Mich. July 23, 2010)). The claims here diverge sharply: Ms. Kloosterman brings a Title VII claim against the hospital, but §1983 and state-law claims against the individual defendants. Even still, the individual defendants argued that their claims nevertheless belong in arbitration

alongside the hospital's under the federal common-law rule that "if [a plaintiff] can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified."  Defs'.Br.ISO.Summ.J., R.74, PageID.1466-68 (second alteration in original) (quoting *Arnold v. Arnold Co.*, 920 F.2d 1269, 1281 (6th Cir. 1990)).  But as Ms. Kloosterman explained in opposition, this Court abrogated that federal common-law rule two years prior.  *See* Pl's.Summ.J.Opp'n, R.76, PageID.1509-10 (citing *AtriCure, Inc. v. Meng*, 12 F.4th 516, 524 (6th Cir. 2021) (abrogating *Arnold*)).  The individual defendants mustered almost nothing in reply—and certainly not any argument about state law.  *See* Defs'.Reply.ISO.Summ.J., R.77, PageID.1564.

That should have ended the matter in Ms. Kloosterman's favor, for "our adversarial system of adjudication" expects "'the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present.'"  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)).  But instead, the district court did its own state-law research and concluded that, contrary to the individual defendants' concession, a single Michigan case that neither party cited allowed the

41

individual defendants to force varying claims against them into arbitration—even claims against them in their personal capacity. *See* Order, R.79, PageID.1594-1600.

The Court should reverse on party-presentation grounds. Courts "normally decide only questions presented by the parties"; they "do not, or should not, sally forth each day looking for" ways to force claims into arbitration. *Sineneng-Smith*, 590 U.S. at 376 (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring)). But the Court can also reverse on the merits: as the next two Sections explain, perhaps because of the lack of party presentation, the district court got both the contract and Michigan law wrong.

### B.    The District Court Erred by Allowing Nonparties to Enforce an Agreement Expressly Barring Nonparty Enforcement.

As a threshold matter, even if the decision below correctly stated Michigan law on nonparty enforcement—it did not, *see infra* Section III.C—it would still have erred in applying that law here. The district court applied its (mis)understanding of Michigan law because it concluded that the employment agreement between Ms. Kloosterman and the hospital otherwise "does not identify *who* is … entitled to enforce" the arbitration clause. Order, R.79, PageID.1598. But the agreement actually addresses this question expressly: Nonparties "shall [not] have the right to enforce any of the provisions contained herein," including the arbitration agreement. 2d.Am.Compl.ex.D, R.69-4, PageID.1305. So whatever Michigan law says about nonparty enforcement, the agreement "opted out" from those default rules here.

42

*Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 547 (Mich. Ct. App. 2007) ("The parties are free to avoid, by contract, what might otherwise be an applicable rule of law."). And that opt-out carries special significance for the arbitration clause, because "a party cannot be required to submit to arbitration any dispute which [s]he has not agreed so to submit." *Bienenstock & Assocs., Inc. v. Lowry*, 887 N.W.2d 237, 242 (Mich. Ct. App. 2016) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

To determine what disputes the parties agreed to arbitrate, "as with any other contract, the parties' intentions control." *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010)). Here, Ms. Kloosterman and the hospital expressed an unambiguous intent to foreclose a nonparty haling them into arbitration. If nothing else, the decision below erred in failing to honor that contractual choice.

## C. The District Court Erred by Concluding that Michigan Law Allows Nonparties to Enforce an Agreement Against a Party Based on an Agency Relationship Alone.

The district court concluded that, "[b]ecause the Individual Defendants were endowed with agency authority over [Ms. Kloosterman]'s employment with [the hospital]," *Altobelli v. Hartmann* empowers them to offensively wield Ms. Kloosterman's employment agreement even though they are not parties to the agreement. Order, R.79, PageID.1600. That incorrectly states Michigan law.

43

To be sure, in certain circumstances, a plaintiff-signatory (i.e., Ms. Kloosterman) may be able to plead an arbitration agreement against a defendant-nonsignatory (i.e., the individual defendants) when the nonsignatory is an agent of a countersignatory (i.e., the hospital). *See AFSCME Council 25 v. Wayne Cnty.*, 811 N.W.2d 4, 12 (Mich. Ct. App. 2011). That makes sense, because a principal should not be able to duck contractual obligations by hiring an agent. But the rule does not automatically work in reverse.

Rather, for defendant-nonsignatories to plead an arbitration agreement against a plaintiff-signatory, Michigan law requires the nonsignatories to show either that the signatory's claims against them "rely on the terms of the written agreement" or that "the signatory raise[d] allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *City of Detroit Police & Fire Ret. Sys. v. GSC CDO Fund Ltd.*, No. 289185, 2010 WL 1875758, at *6 (Mich. Ct. App. May 11, 2010) (quoting *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006)); *see also Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (holding that "a signatory … may be estopped from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the underlying contract"). This too makes sense: For a defendant to inject into the case a contract that it did not

sign, the defendant must at least show a material nexus between the plaintiff's claims and the contract, or between it and another party to the contract.

The individual defendants did neither. Ms. Kloosterman's §1983 and state-law claims against the individual defendants do not rely on her employment agreement. And her multiple claims against the individual defendants differ in important respects from her one claim against the hospital. As the individual defendants acknowledged below, a signatory alleges substantially interdependent and concerted misconduct between a nonsignatory and signatory only when "all claims in [a] plaintiff's complaint against nonsignatories were also brought against" a signatory. *City of Detroit Police & Fire Ret. Sys.,* 2010 WL 1875758, at *7; *see also Steward*, 2023 WL 3395444, at *2 ("dispute involv[ed] indistinguishable factual claims" against a party and nonparties); *cf.* Defs'.Br.ISO.Summ.J., R.74, PageID.1467 (arguing that "where claims against individual employees or owners of a company are identical to those against the company, the claims against the individuals are similarly governed by the agreement to arbitrate").

Here, the claims against the individual defendants cleanly break from the claims against the hospital—as the individual defendants' choice to file their own motion to dismiss confirms. The claims against the hospital rely on different causes of action and different liability theories; Ms. Kloosterman could conceivably lose against the hospital but prevail against the individual defendants (or vice versa).

That is particularly evident given that Ms. Kloosterman has sued the individual defendants not just in their official capacity as hospital employees, but also in their personal capacity as individuals.  Because Ms. Kloosterman "allege[s] tortious acts by [a nonparty] that are separate and apart from [a party's]," enabling the Court to evaluate the "actions against" the individual defendants "without considering the actions of" the hospital, the individual defendants cannot invoke the agreement between Ms. Kloosterman and the hospital.  *Tobel v. AXA Equitable Live Ins. Co.*, No. 298129, 2012 WL 555801, at *11 (Mich. Ct. App. Feb. 21, 2012).

*Altobelli* does not change this analysis.  In fact, properly understood, *Altobelli* does not address nonparty enforcement at all.  In *Altobelli*, a former law-firm partner sued his former partners alleging that they had tortiously breached the firm's operating agreement, which was an agreement "by and between" all partners *that all partners had signed*.  884 N.W.2d at 539, 541 & n.3.  The question before the court was whether the "extremely broad and inclusive" arbitration clause that all partners had signed—extending to "[a]ny dispute …. between the Firm or the Partnership and any current or former Principal … of any kind or nature whatsoever"—covered the plaintiff's lawsuit against his former partners.  *Id.* at 539, 547.  The Michigan Supreme Court had little difficulty answering affirmatively, holding that a lawyer's dispute with his former partners about an agreement they all signed constituted a

46

"dispute … between the Firm or the Partnership and any current or former Principal." *Id.* at 539.

All told, *Altobelli* lands far afield from the situation here.  The individual defendants did not sign Ms. Kloosterman's employment agreement,[5] and Ms. Kloosterman's multiple claims against them implicate different allegations and different legal standards from her sole claim against the hospital.  But the district court failed to appreciate these distinctions.  Instead, it improperly reached out to decide an issue that neither side briefed, and compounded that error by overreading *Altobelli* to announce a sweeping rule allowing nonparty-agents to always benefit from contracts that they did not sign.  That is not the law.  At the very least, Ms. Kloosterman's claims against the individual defendants belong in federal court.

---

[5] Admittedly, Pai's electronic signature appears on Ms. Kloosterman's final employment agreement as a proxy for the hospital, *see* Pl's.Summ.J.Opp'n.ex.C, R.76-4, PageID.1538, but he did not sign on his own behalf, *cf.* 2d.Am.Compl.ex.D, R.69-4, PageID.1306 (hospital president signed initial agreement on behalf of Metro Health Hospital); Pl's.Summ.J.Opp'n.ex.B, R.76-3, PageID.1534 (same for second agreement).  Put differently, the hospital was the party—not Pai himself.  Underscoring the point, Pai has never argued that he stands on different footing from the other individual defendants, and he joined in their prior acknowledgement that only "where claims against individual employees or owners of a company are identical to those against the company" are "the claims against the individuals … similarly governed by the agreement to arbitrate." Defs'.Br.ISO.Summ.J., R.74, PageID.1467.  Yet even if his e-signature on the employment agreement were enough to make him a party to the employment agreement, that would only buttress the conclusion that the other individual defendants are not parties, and thus that claims against them belong in federal court.

## CONCLUSION

The Court should reverse the judgment and remand for discovery in the district court.

Respectfully submitted,

JEFFREY C. MATEER
DAVID J. HACKER
DOUG PETERSON
ROGER L. BYRON
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy. #1600
Plano, TX 75075

KAYLA A. TONEY
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. NW #1410
Washington, DC 20004

July 31, 2024

s/Kevin Wynosky
ERIN E. MURPHY
KEVIN WYNOSKY*
  *Counsel of Record*
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
kevin.wynosky@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B)'s type-volume limitation because, according to Microsoft Word for Microsoft 365's word-count function, the brief contains 11,074 words, excluding the parts that Federal Rule of Appellate Procedure 32(f) and 6th Circuit Rule 32(b) exempt from the word count.

2.    This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because the brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

<u>s/Kevin Wynosky</u>
Kevin Wynosky

## CERTIFICATE OF SERVICE

I certify that on July 31, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system.  I certify that all participants are registered CM/ECF users and that the CM/ECF system will accomplish service.

s/Kevin Wynosky
Kevin Wynosky

## DESIGNATION OF RELEVANT ORIGINATING COURT DOCUMENTS

Plaintiff-Appellant Valerie Kloosterman designates these district court documents as relevant to this matter:

| Record Entry | Description of Document | Page ID # |
|:---:|:---:|:---:|
| 15 | Brief in Support of Individual Defendants' Motion to Dismiss the Original Complaint | 199 |
| 17 | Brief in Support of Defendant Metropolitan Hospital's Motion to Dismiss the Original Complaint | 235 |
| 35 | Brief in Support of Individual Defendants' Motion to Dismiss the First Amended Complaint | 640 |
| 37 | Brief in Support of Defendant Metropolitan Hospital's Motion to Dismiss the First Amended Complaint | 685 |
| 68 | Opinion & Order Granting-in-Part and Denying-in-Part Defendants' Motions to Dismiss the First Amended Complaint, Granting-in-Part and Denying-in-Part Plaintiff's Motion for Leave to File a Second Amended Complaint | 1189 |
| 69 | Second Amended Complaint & Exs. A–I | 1232 |
| 71 | Answer | 1345 |
| 74 | Brief in Support of Defendants' Motion for Summary Judgment to Compel Arbitration | 1458 |
| 76 | Plaintiff's Opposition to Defendants' Motion for Summary Judgment to Compel Arbitration & Exs. A–E | 1483 |
| 77 | Reply Brief in Support of Defendants' Motion for Summary Judgment to Compel Arbitration | 1549 |
| 78 | Plaintiffs' Notice of Supplemental Authority in Opposition to Defendants' Motion for Summary Judgment to Compel Arbitration | 1569 |
| 79 | Opinion & Order Granting Defendants' Motion for Summary Judgment to Compel Arbitration | 1583 |

| 80 | Judgment | 1605 |
| 81 | Notice of Appeal | 1606 |