No. 24-1398

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

Valerie Kloosterman,

*Plaintiff-Appellant,*

*v.*

Metropolitan Hospital et al.,

*Defendants-Appellee.*

On Appeal from the United States District Court
for the Western District of Michigan
Case No. 1:22-cv-944-JMB-SJB

## BRIEF *AMICUS CURIAE* OF THE FOUNDATION FOR MORAL LAW IN SUPPORT OF APPELLANT

John Eidsmoe*
**Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

August 7th, A.D. 2024          Counsel for *Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Sixth Circuit Rule 26.1 and Rule 29(a)(4)(A) of the Federal Rules of Appellate Procedure, the *amicus* Foundation for Moral Law, Inc., certifies that it is not a subsidiary or affiliate of a publicly owned corporation.


/s/ *John Eidsmoe*
John Eidsmoe

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................... C-1

TABLE OF CONTENTS.................................................................... i

TABLE OF AUTHORITIES ............................................................ ii

INTEREST OF THE *AMICUS* ....................................................... 1

ARGUMENT .................................................................................. 2

I.    The Michigan Health policy violates Valerie's First Amendment rights to free exercise of religion and freedom of speech .................... 3

    A. The Framers held a jurisdictional view of Church and State .......... 3

    B. The Framers derived their understanding of Church/State relations from the Bible and the Judeo-Christian tradition ........................... 4

    C. The Framers held a jurisdictional understanding of Church/State relations ......................................................................... 9

    D. This jurisdictional understanding of Church/State relations also applies to the Free Exercise clause ................................................ 13

II.   Brownsburg's policy constitutes compelled speech and thus violates Kluge's First Amendment right to freedom of speech ...................... 19

III.  A routine boiler-plate arbitration clause cannot be used to compel an employee to arbitrate her most basic constitutional rights ................. 20

CONCLUSION ............................................................................. 25

CERTIFICATE OF COMPLIANCE.............................................. 27

CERTIFICATE REGARDING SERVICE .................................. 28

# TABLE OF AUTHORITIES

**Cases**                                                                               **Pages**

*303 Creative v. Elenis,*
   600 U.S. 570 (2023) ................................................................ 19

*Bayo v. Napolitano,*
   593 F.3d 495 (7th Cir. 2010) ................................................. 23

*Davis Oil Co. v. Mills,*
   873 F.2d 774 (5th Cir. 1989) ............................................. 22-23

*Doe v. Marsh,*
   105 F.3d 106 (2d Cir. 1997) .................................................. 22

*Democratic Nat'l Comm. v. Republican Nat'l Comm.,*
   673 F.3d 192 (3d Cir. 2012) .................................................. 22

*Echavarria v. Pitts,*
   641 F.3d 92 (5th Cir. 2011) ............................................... 22-23

*Employment Division Dept. of Human Resources of Oregon v. Smith,*
   494 U.S. 872 (1990) .......................................................... 17-18

*Erie Telecomm., Inc. v. City of Erie,*
   853 F.2d 1084 (3d Cir. 1988) ............................................... 22

*Everson v. Bd. of Educ. of the Twp. of Ewing,*
   330 U.S. 1 (1947) ......................................................... 11-12, 16

*Fuentes v. Shevin,*
   497 U.S. 67 (1972) ............................................................ 21-23

*Hollins v. Methodist Healthcare, Inc.,*
   474 F.3d 223   (6th Cir. 2007) ............................................ 21-22

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
   132 S. Ct. 694 (2012) ......................................................... 21-22

*In re Workers' Comp. Refund*,
    46 F.3d 813 (8th Cir. 1995) ..................................................... 23

*Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke County*,
    149 F.3d 277 (4th Cir. 1998) ................................................... 22

*McGowan v. Maryland*,
    366 U.S. 420 (1961).......................................................... 13-14

*National Institute of Family and Life Advocates v Becerra*,
    585 U.S. 755 (2018)................................................................. 19

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*,
    No. 20A87 (U.S. Nov. 25, 2020)............................................. 18

*South Bay United Pentecostal Church v. Newsom*,
    141 S. Ct. 716 (2021) .............................................................. 18

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021)............................................................ 18

*United States v. Macintosh*,
    283 U.S. 605 (1931).......................................................... 16-17

*Walls v. Cent. Contra Costa Transit Auth.*,
    653 F.3d 963 (9th Cir. 2011) ................................................... 23

*West Virginia State Board of Education v. Barnette*,
    319 U.S. 624 (1943)................................................................. 19

*Wooley v. Maynard*,
    430 U.S. 705 (1977)................................................................. 19

*Zorach v. Clauson*,
    343 U.S. 306 (1952).......................................................... 13-14

## Other Authorities

Dr. Donald S. Lutz, "The Relative Influence of European Writers on Late Eighteenth-Century American  Political Thought," *American Political Science Review*, 189 (1984).......................................................................4

Edward L. Rubin, Toward a General Theory of Waiver, 28 UCLA L. Rev. 478 (1981)................................................................................. 23-24

George Washington, May 1789; quoted by Paul F. Boller, Jr., George Washington and Religion  (Dallas: Southern Methodist University Press, 1963) ..........................................................................................9

Hebden Taylor, *The Christian Philosophy of Law, Politics, and the State* (Nutley, NJ: Craig Press, 1966)..................................................6

James Madison, *Memorial and Remonstrance* (June 20, 1785).......... 2, 10-11

James Madison, Veto Message, February 21, 1811, http://baptiststudiesonline.com/wp-content/uploads/2018/03/Madison-VetoMessageCongress.pdf ....................................................... 10

John Calvin, Institutes of the Christian Religion, 1537...................................8

John of Damascus, *Second Speech against Those Who Reject Images*, reprinted in O'Donovan, 213-15 ................................................7

Martin Luther, "Secular Authority: To What Extent It Should Be Obeyed," 1523, reprinted in *Works of Martin Luther* (Grand Rapids: Baker Book House, 1982)................................................................................8

M.E. Bradford, *A Worthy Company: Brief Lives of the Framers of the United States Constitution* (Marlborough, ND: Plymouth Rock Foundation, 1982) ...........................................................................................7

Norman Cousins, "*In God We Trust*" (New York: Harper & Brothers, 1958) ............................................................................................ 11

Sydney E. Ahlstrom, A Religious History of the American People (Doubleday, 1975) ................................................................... 7-9

## INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law, Inc. ("the Foundation") is a non-profit, non-partisan public interest organization dedicated to the defense of constitutional liberties and to the strict interpretation of the Constitution as intended by its Framers. The Foundation has a direct interest in this case because we believe that the free exercise of religion and freedom of speech are under attack in America. A new religion of progressive secularism is becoming the de facto public doctrine, and any who dare act according to their religious beliefs and convictions otherwise are punished. The Foundation believes the present case is a prime example of this new status quo which must be reversed lest the recognition of our God-given freedoms perish in America.

---

[1] *Amicus* submits this brief accompanied by a motion for leave to file. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

## ARGUMENT

For the past 17 years, Valerie Kloosterman (hereinafter "Valerie") has served her community as a physician assistant in western Michigan, receiving "stellar" reviews for her job performance and being specifically requested by many patients. As a devout Christian, she believes "that the Bible is the inspired Word of God: she saw no conflict between her work and her Christian faith until 2021 when University of Michigan Health took over her clinic and imposed mandatory diversity, equity, and including training which required Valerie to affirm statements that violated her religious beliefs and her medical judgment. For example, she was required to affirm that "gender is fluid."

She exhausted administrative remedies by asking for an accommodation, explaining that she could not participate in or affirm gender-transition procedures or use pronouns that falsely obscured the true nature of sexuality. Michigan Health officials tried to intimidate her by calling her "evil" and a "liar" and telling her that stance on LGBTQ issues was contributing to suicide rates. After they failed to change Valerie's beliefs or pressure her to violate her beliefs, Michigan Health fired her, even though she had a "stellar" record of patient care.

Valerie sued for wrongful termination. After failing in most aspects of their motion to dismiss, Michigan Health moved to send the case to

arbitration, even though thirteen months of litigation had already occurred, because Valerie had signed an arbitration agreement in 2009. The District Court issued an order compelling arbitration, and Valerie appeals from this order.

The Foundation argues that (1) Free exercise of religion and freedom of speech are unalienable God-given rights recognized at the beginning of our Bill of Rights; and (2) Valerie cannot be compelled to arbitrate God-given rights of this importance.

**I.    The Michigan Health policy violates Valeries's First Amendment rights to free exercise of religion and freedom of speech.**

Let us consider the high value the Framers of our Constitution placed upon religious freedom.

### A. The Framers held a jurisdictional view of Church and State.

*It is proper to take alarm at the first experiment on our liberties.*
*We hold this prudent jealousy to be the first duty of citizens, and*
*one of the noblest characteristics of the late Revolution.*

James Madison, *A Memorial and Remonstrance*, 1785, Works 1:163.

As Jefferson recognized in the Declaration of Independence, this nation is founded on the "laws of nature and of nature's God," and the "unalienable" rights to "life, liberty, and the pursuit of happiness" are "endowed by [the] Creator." The Framers viewed church and state as separate institutions with

3

separate jurisdictions.  When Jefferson spoke of a "wall of separation between church and state," he meant a jurisdictional separation.

### B. The Framers derived their understanding of Church/State relations from the Bible and the Judeo-Christian tradition.

The Framers did not view Church and State simply as man-made institutions.  They did not accept Rousseau's notion that the State is above the Church and above all other institutions.[2]  Like the people of their time and those of preceding generations, they understood Church and State as divinely-established institutions, each with distinctive authority and distinctive limitations.

This institutional separation goes back to the ancient Hebrews.  Going back to the time of Moses and perhaps further back to the time of Jacob's sons Judah and Levi, the Levites (descendants of Levi, the Tribe of Levi) served as Israel's religious authority, the priests.  From the time of King David onward, Israel's kings came out of the tribe of Judah.  These were separate offices and separate jurisdictions, but both were subject to the will of God and the Law of God.  On several occasions, God disciplined kings severely for usurping the functions of the priesthood.  For example, when King Saul offered sacrifices

---

[2] Dr. Donald S. Lutz, "The Relative Influence of European Writers on Late Eighteenth-Century American Political Thought," *American Political Science Review*, 189 (1984) 189-97, studied citations of European thinkers by American writers 1760-1805 and demonstrated that American writers most frequently cited Montesquieu (8.3%), Blackstone (7.9%), and Locke (2.9%), and cited much less frequently (0.9%).

instead of waiting for Samuel the priest, God cut off his descendants from the kingship forever. When King Uzziah tried to usurp the functions of the priesthood by burning incense on the altar in the Temple, eighty "valiant" priests withstood him, saying

"It appertaineth not to thee, Uiziah, to burn incense to the Lord, but to the priests the sons of Aaron, that are consecrated to burn incense: go out of the sanctuary; for thou hast trespassed." (II Chronicles 26:16-18). When Uzziah persisted, God smote him with leprosy, and he remained a leper all the days of his life (II Chron 2:19-23).

This institutional separation continued in the New Testament. As Lord Action describes Christ's answer to the Pharisees about paying taxes to the Roman government, (Matthew 22:21),

> It was left for Christianity to animate old truths, to make real the metaphysical barrier which philosophy had erected in the way of absolutism. The only thing Socrates could do in the way of a protest against tyranny was to die for his convictions. The Stoics could only advise the wise man to hold aloof from politics and keep faith with the unwritten law in his heart. But when Christ said "Render unto Caesar the things that are Caesar's and unto God the things that are God's," He gave to the State a legitimacy it had never before enjoyed, and set bounds to it that had never yet been acknowledged. And He not only delivered the precept but He also forged the instrument to execute it. To limit the power of the State ceased to be the hope of patient, ineffectual

philosophers and became the perpetual charge of a universal Church.[3]

It is neither surprising nor unreasonable to conclude that the Framers derived their understanding of church / state relations from religious sources. On October 4, 1982, Congress passed, and the President then signed, Public Law 97-280, declaring 1983 the "Year of the Bible." The opening clause of the bill reads:

> Whereas, Biblical teachings inspired concepts of civil government that are contained in our Declaration of Independence and the Constitution of the United States...

The Bible, coupled with Church and Jewish tradition, is therefore relevant to the Framers' understanding of Church and State.

From the beginning, Church scholars understood that Church and State were distinct kingdoms, but they sometimes differed as to the relationship between them. Some, like the North African lawyer and Church Father Tertullian (c. AD 200), asked, "What concord hath Athens with Jerusalem?" Augustine of Hippo (AD 356-430), whose Civitas Dei "set the very course of Western Civilization,"[4] wrote of the City of God and the City of Man,

---

[3] Lord Action, quoted by Gertrude Himmelfarb (London, 1955) p. 45; in ElL. Hebden Taylor, *The Christian Philosophy of Law, Politics, and the State* (Nutley, NJ: Craig Press, 1966) pp. 445-46.
[4] Martin Luther describes Augustine's masterpiece as "one of the most influential works of the Middle Ages." quoted at http://grantian.blogspot.com/2006/11/tale-of-two-men.html; *Encyclopedia Britannica*, https://www.britannica.com/topic/The-City-of-God

although he did not precisely identify the City of God as the Church or the

City of Man as the State.

> Still others, such as John of Damascus (ca. 670-ca. 750), declared that

> Kings have no right to make laws for the church.  As the apostle says, "God has appointed in the church first apostles, second prophets, third pastors and teachers" (I Cor. 12:28) "for the equipment" of the church (Eph 4:12).  No mention of kings!
> . . .
> Saul tore the cloak of Samuel, and what became of him?  God tore the kingdom from him, and gave it to David, a man of self-restraint.  Jezebel pursued Elijah, and the swine and dogs licked up her blood , and the prostitutes washed in it. . . . Herod destroyed John, and was eaten by worms and perished.
> . . .
> [H]e said, "Give to Caesar what is Caesar's, and to God what is God's (Matthew 22:15-21). We defer to you, o king, in the affairs of life, in tax and revenue and privileges, and in all of our affairs that are your responsibility.  In the management of the church we have pastors who have spoken the word of God to us, and have given form to the law of the church.[5]

The Protestant Reformation took force in Northern Europe in the 1500s,

a century before the settlement of the English colonies in North America.  The

Reformers' understanding of the Two Kingdoms of Church and State is

therefore instrumental in understanding the views of the Framers. Most of

them were children of the Reformation,[6]  and as such they understood that

---

[5] John of Damascus, *Second Speech against Those Who Reject Images*, reprinted in O'Donovan, 213-15.
[6] As Dr. M.E. Bradford established in *A Worthy Company: Brief Lives of the Framers of the United States Constitution* (Marlborough, ND: Plymouth Rock Foundation, 1982) pp. iv-v, the fifty-five delegates to the Constitutional Convention included 28 Episcopalians, 8 Presbyterians, 2 Lutherans, 2 Dutch Reformed, 2 Methodists, 2 Roman Catholics, one uncertain, and 3 who might be Deists. Yale History Professor Sydney

God had established two kingdoms, Church and State, each with distinctive

authority.  As Luther said,

> . . . these two kingdoms must be sharply distinguished, and both
> be permitted to remain; the one to produce piety, the other to
> bring about external peace and prevent evil deeds; neither is
> sufficient in the world without the other.[7]

And as John Calvin stated in his Institutes of the Christian Religion,

> Let us first consider that there is a twofold government in man:
> one aspect is spiritual, whereby the conscience is instructed in
> piety and in reverencing God; the second is political, whereby
> man is educated for the duties of humanity and citizenship that
> must be maintained among men. These are usually called the
> 'spiritual' and the 'temporal' jurisdiction (not improper terms) by
> which is meant that the former sort of government pertains to the
> life of the soul, while the latter has to do with the concerns of the
> present life - not only with food and clothing but with laying
> down laws whereby a man may live his life among other men
> holily, honorably, and temperately. For the former resides in the
> inner mind, while the latter regulates only outward behavior. The
> one we may call the spiritual kingdom, the other, the political
> kingdom. Now these two, as we have divided them, must always
> be examined separately; and while one is being considered, we
> must call away and turn aside the mind from thinking about the
> other. There are in man, so to speak, two worlds, over which
> different kings and different laws have authority.[8]

This understanding of Church and State as two separate kingdoms, both

established by God but with separate spheres of authority, shaped the legal

---

E. Ahlstrom has said:  "If one were to compute such a percentage on the basis of all the German, Swiss,
French, Dutch, and Scottish people whose forebears bore the 'stamp of Geneva' in some broader sense, 85 or
90 percent would not be an extravagant estimate." Sydney E. Ahlstrom, *A Religious History of the American
People* (Garden City, NY: Doubleday & Co., Image Books, 1975) I:169.

[7] Martin Luther, "Secular Authority: To What Extent It Should Be Obeyed," 1523, reprinted in *Works of
Martin Luther* (Grand Rapids: Baker Book House, 1982), III:237.

[8] John Calvin, *Institutes of the Christian Religion*, 1537, III:19:15.

and political thinking of the Reformers, of the colonists, and of the Framers of the Declaration of Independence, the Constitution, and the Bill of Rights. As Yale History Professor Sydney E. Ahlstrom has noted,

> No factor in the "Revolution of 1607-1760" was more significant to the ideals and thought of colonial Americans than the Reformed and Puritan character of their Protestantism; and no institution played a more prominent role in the molding of colonial culture than the church. Just as Protestant convictions were vitally related to the process of colonization and a spur to economic growth, so the churches laid the foundations of the educational system, and stimulated most of the creative intellectual endeavors, by nurturing the authors of most of the books and the faculties of most of the schools. The churches offered the best opportunity for architectural expression and inspired the most creative productions in poetry, philosophy, music, and history.[9]

### C. The Framers held a jurisdictional understanding of Church/State relations.

Long before Jefferson would speak of the "wall of separation between church and state," Rhode Island founder Roger Williams wrote of a "gap in the hedge or wall of separation between the garden of the church and the wilderness of the world," and George Washington declared to the General Committee of United Baptist Churches in Virginia that "no one would be more zealous than myself to establish effectual barriers against the horrors of spiritual tyranny, and every species of religious persecution."[10]

---

[9] Sydney E. Ahlstrom, *A Religious History of the American People* (Doubleday, 1975), I:423.
[10] George Washington, May 1789; quoted by Paul F. Boller, Jr., *George Washington and Religion* (Dallas: Southern Methodist University Press, 1963) 169-70.

9

Reflecting this same jurisdictional view of Church and State, James Madison as President vetoed "an Act incorporating the Protestant Episcopal Church in the town of Alexandria, in the District of Columbia":

> Because the bill exceeds the rightful authority to which governments are limited by the essential distinction between civil and religious functions, and violates in particular the article of the Constitution of the United States which declares that "Congress shall make no law respecting a religious establishment." The bill enacts into and establishes by law sundry rules and proceedings relative purely to the organization and polity of the church incorporated, and comprehending even the election and removal of the minister of the same, so that no change could be made therein by the particular society or by the general church of which it is a member, and whose authority it recognizes. This particular church, therefore, would so far be a religious establishment by law, a legal force and sanction being given to certain articles in its constitution and administration.[11]

Madison's veto was consistent with his jurisdictional view of Church and State. In his "Memorial and Remonstrance Against Religious Assessments" (1785), he objected to a proposed tax for the support of Christian churches and pastors, not because he opposed the Church, but because Christianity is "the Religion which we believe to be of divine origin." Christianity, he said, is a religion of "innate excellence" and a religion that enjoys the "patronage of its Author."  Christianity therefore does not need the aid of the State:

---

[11] James Madison, Veto Message, February 21, 1811, http://baptiststudiesonline.com/wp-content/uploads/2018/03/Madison-VetoMessageCongress.pdf

10

...the establishment proposed by this Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself: for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them; and not only during the period of miraculous aid [the New Testament period and shortly thereafter], but long after it had been left to its on evidence, and the ordinary care of Providence: Nay, it is a contradiction in terms; for a Religion not invented by human policy, must have pre-existed and been supported, before it was established by human policy.[12]

Jefferson's "wall of separation" must be viewed in this context, as a jurisdictional separation between the two kingdoms, Church and States.  As he wrote in 1808,

I consider the government of the United States as interdicted by the Constitution from intermeddling in religious institutions, their doctrines, discipline, or exercises. This results not only from the provision that no law shall be made respecting the establishment or free exercise of religion, but from that also which reserves to the states the powers not delegated to the United States. Certainly, no power to prescribe any religious exercise or to assume authority in religious discipline has been delegated to the General Government. It must rest with the States, as far as it can be in any human authority.[13]

---

[12] James Madison, "Memorial and Remonstrance Against Religious Assessments," 1785, reprinted in Norman Cousins, "*In God We Trust*" (New York: Harper & Brothers, 1958)  308-14. https://founders.archives.gov/documents/Madison/01-08-02-0163
[13] Thomas Jefferson, Letter to Samuel Miller, January 23, 1808; "Thomas Jefferson on Separation of Church and State," https://candst.tripod.com/tnppage/qjeffson.htm.  Jefferson's closing statement that authority over churches "must rest with the States, as far as it can be in any human authority," reflects his belief that the First Amendment restricts only the federal government and not the States.  Rightly or wrongly, the Supreme Court has incorporated the First Amendment and applied it to the States in *Cantwell v. Connecticut*, 310 US. 296 (1940),  *Everson v. Board of Education*, 330 U.S. 1 (1947), and subsequent cases.

The first Supreme Court Establishment Clause case, *Everson v. Board of Education*, 330 U.S. 1 (1947), is consistent with this jurisdictional understanding of the kingdoms of Church and State.  As the Court explained at 18 (emphasis added):

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. *Neither can force nor influence a person to go to or to remain away from church against his will* or force him to profess a belief or disbelief in any religion. *No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.* No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever from they may adopt to teach or practice religion. *Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa.*

*Everson* did not address issues of strict scrutiny, compelling interest, or rational basis.  Nor did the Court discuss specific types of state regulation of churches.  Rather, the Court stated as an absolute that "neither a state nor the Federal Government" can "force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion."

After providing that "Congress shall make no law respecting an establishment of religion," the First Amendment adds an equally important clause, "or prohibiting the free exercise thereof."

Like the Establishment Clause, the Free Exercise Clause is also jurisdictional, because there is a jurisdiction—"our duty to God and the manner of discharging it"—that is beyond the jurisdiction of government.

### D. This jurisdictional understanding of Church/State relations also applies to the Free Exercise clause.

The Framers held a jurisdictional understanding of Free Exercise. Certainly, foremost among the rights included in the term "liberty" in the Declaration of Independence is the right to free exercise of religion.

As the Declaration makes clear, this nation was founded upon Higher Law. The Supreme Court said in *Zorach v. Clauson,* 343 U.S. 306, 313 (1952), "We are a religious people whose institutions presuppose a Supreme Being." The Court found that recognition is completely compatible with statements such as "We guarantee the freedom to worship as one chooses," *id.* at 314, and "There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal." *Id.* at 312.

And in *McGowan v. Maryland* (1961), Justice Douglas, the author of the *Zorach* opinion, stated in dissent:

The institutions of our society are founded on the belief that there is an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the individual possesses rights, conferred by the Creator, which government must respect.

This is entirely consistent with Madison's understanding of free exercise. As he said in the Remonstrance,

We remonstrate against the said Bill,

Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence." [quoting from Article XVI of the Virginia Declaration of Rights of 1776]. The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will

14

of the majority; but it is also true that the majority may trespass on the rights of the minority.[14]

Establishment and Free Exercise go together.  In the term "free exercise thereof," the word "thereof" refers back to "religion" in the Establishment Clause.  The very punctuation of the First Amendment sets these clauses apart from the rest.  There are three parts to the First Amendment, separated by semicolons, and each of these parts consists of two clauses, separated by commas:

"Congress shall make no law"

(1)  "respecting an establishment of religion, or prohibiting the free exercise thereof;"
(2) "or abridging the freedom of speech, or of the press;"
(3) "or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

Note, also, that the one verb "abridging" introduces the last two parts and sub-parts, thus further setting these last four cluses from the first two, the religion clauses which contain the verbs "respecting" and "prohibiting."

Jefferson's words, quoted earlier, pertain to both establishment and free exercise:

I consider the government of the United States as interdicted by the Constitution from intermeddling in religious institutions, their doctrines, discipline, or *exercises.* This results not only from the provision that no law shall be made respecting the establishment or free exercise of religion, but from that also

---

[14] Madison, Remonstrance, https://founders.archives.gov/documents/Madison/01-08-02-0163.

> which reserves to the states the powers not delegated to the
> United States. *Certainly, no power to prescribe any religious
> exercise or to assume authority in religious discipline has been
> delegated to the General Government.* It must rest with the
> States, as far as it can be in any human authority.

(Emphasis added). The Court's explanation of the Establishment Clause in *Everson* applies in part to Free Exercise as well: "Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance." Each of these directives is focused on the exercise of religion.

In *United States v. Macintosh,* 283 U.S. 605, 633-35 (1931), the Court recognized in a case involving a person seeking citizenship who held conscientious objections to military service:

> Much has been said of the paramount duty to the state, a duty to
> be recognized, it is urged, even though it conflicts with
> convictions of duty to God. Undoubtedly that duty to the state
> exists within the domain of power, for government may enforce
> obedience to laws regardless of scruples. When one's belief
> collides with the power of the state, the latter is supreme within
> its sphere and submission or punishment follows. But, in the
> forum of conscience, duty to a moral power higher than the state
> has always been maintained. The reservation of that supreme
> obligation, as a matter of principle, would unquestionably be
> made by many of our conscientious and law-abiding citizens.
> The essence of religion is belief in a relation to God involving
> duties superior to those arising from any human relation. As was
> stated by Mr. Justice Field, in *Davis v. Beason*, 133 U. S. 333,

16

> 342: 'The term 'religion' has reference to one's views of his
> relations to his Creator, and to the obligations they impose of
> reverence for his being and character, and of obedience to his
> will.' . . . The battle for religious liberty has been fought and won
> with respect to religious beliefs and practices, which are not in
> conflict with good order, upon the very ground of the supremacy
> of conscience within its proper field. What that field is, under our
> system of government, presents in part a question of
> constitutional law, and also, in part, one of legislative policy in
> avoiding unnecessary clashes with the dictates of conscience.

The Court said the conflict between the power of the state and what the person

believes to be his duty to God must be resolved on jurisdictional grounds.  In

areas in which the state has jurisdiction, its needs must take precedence, but

in areas in which the state does not have jurisdiction, the individual conscience

must take precedence.

The Court has sometimes recognized the power of the State to

regulation certain arguably religious practices.  But at least within the area of

church doctrine and church worship and attendance, the Court has recognized

a jurisdictional limit to the Free Exercise Clause.  In *Unemployment Division

v. Smith,* 494 U.S. 872 (1990), Justice Scalia recognized that jurisdictional

limit in his majority opinion at 877-78:

> The free exercise of religion means, first and foremost, the right
> to believe and profess whatever religious doctrine one desires.
> Thus, the First Amendment obviously excludes all
> "governmental regulation of religious beliefs as such." The
> government may not compel affirmation of religious belief,
> punish the expression of religious doctrines it believes to be
> false, impose special disabilities on the basis of religious views

or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

(Emphasis added) (internal citations omitted).

In 2020 and 2021, the Supreme Court decided three cases which involved the closure of churches because of COVID-19, and ruled in all three cases that the Governors of New York and California violated the free exercise clause:  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 63 (Nov. 25, 2020), *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (Feb. 5, 2021), and *Tandon v. Newsom*, 141 S. Ct. 1294, 1294 (April 9, 2021).

This is not surprising.  Over the years, the courts have wrestled with what practices are protected by the Free Exercise Clause.  But one thing has been clear from the beginning:  If the Free Exercise Clause protects nothing else, it protects the right to go to church and worship, and the right to believe and speak in accordance with one's religious convictions.  Even the concurrence in *Smith* recognized that

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not

be submitted to vote; they depend on the outcome of no elections.[15]

## II.   Michigan Health's policy constitutes compelled speech and thus violates Valerie's First Amendment right to freedom of speech.

Under the Compelled Speech Doctrine, forcing someone to say something he doesn't want to say is as much a First Amendment violation as prohibiting him from saying what he does want to say.  In fact, it might be a greater violation: Telling a liberal Democrat he may not criticize Donald Trump is offensive, but forcing hm to praise Donald Trump is even more offensive than remaining silent.

The Supreme Court has articulated the Compelled Speech Doctrine in many cases, including *West Virginia State Board of Education v. Barnette,* 319 U.S. 624 (1943) (public school children may not be forced to participate in flag salute); *Wooley v. Maynard,* 430 U.S. 705 (1977) (New Hampshire motor vehicle owner may not be forced to display "Live Free or Die" motto on license plate); *National Institute of Family and Life Advocates v Becerra,* 585 U.S. 755 (2018) (crisis pregnancy center may not be compelled to display abortion information); *303 Creative v. Elenis,* 600 U.S. 570 (2023) (website designer may not be compelled to design a website for a same-sex wedding).

---

[15] *Id.* at 903 (O'Conner, J., concurring).

By forcing Valerie to affirm that "gender is fluid" when she knows from the Word of God and from medical science that it is not, Michigan Health's policy compels Valerie to say what she believes God's Word forbids her to say. This is a classic instance of compelled speech.

## III.    A routine boiler-plate arbitration clause cannot be used to compel an employee to arbitrate her most basic constitutional rights.

On or about December 1, 2009—five years after Valerie began working as a physician assistant at Metro Health Hospital in 2004—she and Metro Health entered into a Physician Assistant Employment Agreement which ran from December 1, 2009 to June 30, 2011, and which was to be automatically renewed annually thereafter. The agreement contained the following clause:

> Any controversy, dispute or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled in accordance with the then existing rules of the American Arbitration Association and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The fees and expenses for such arbitration shall be paid equally by the Hospital and Physician Assistant.

Valerie signed this agreement without consulting an attorney or asking anyone's advice.  At this time (2009) the terms diversity, equity, and inclusion (DEI) were unheard-of, *Obergefell v Hodges* was still six years in the future, terms like transgender and gender identification were almost entirely absent from common vocabulary, and never in her wildest dreams did Valerie nor her employer would have imagined that, more than a decade later, the

arbitration agreement would ever affect such matters as DEI training and being forced to confirm that "gender is fluid."

If this arbitration agreement is held to be valid as applied to this case, it means Valerie has waived her right to defend in court her God-given right to free exercise of religion and free speech. The Foundation questions whether such basic constitutional rights can be waived under any circumstances; but even if they can be waived, it must be with the same standard we apply to waiver of constitutional right in criminal justice: the waiver must be knowing and voluntary.

In *Fuentes v. Shevin,* 497 U.S. 67, 95 (1972), the Supreme Court invalidated consumer repossession agreements when

> There was no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power. The purported waiver provision was a printed part of a form sales contract and a necessary condition of the sale. The appellees made no showing whatever that the appellants were actually aware or made aware of the significance of the fine print now relied upon as a waiver of constitutional rights.

This Court held in *Hollins v. Methodist Healthcare, Inc*., 474 F.3d 223, 226 (6th Cir. 2007) that the appropriate standard for waiver of a constitutional right is  that it must have been "voluntarily, intelligently, and knowingly" made (citing *Fuentes*, 407 U.S. at 94–95)), abrogated on other grounds by

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694 (2012).

A review of the decisions of other circuits may be helpful. For the Second Circuit, see *Doe v. Marsh*, 105 F.3d 106, 111 (2d Cir. 1997) (noting that Second Circuit precedent "suggests that the waiver of a fundamental right in the context of civil cases must be made voluntarily, knowingly and intelligently.")

Third Circuit: *Democratic Nat'l Comm. v. Republican Nat'l Comm*., 673 F.3d 192, 205 (3d Cir. 2012) ("[C]onstitutional rights . . . may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver." (*quoting Erie Telecomm., Inc. v. City of Erie*, 853 F.2d 1084, 1096 (3d Cir. 1988))), petition for cert. filed, 81 U.S.L.W. 3197 (U.S. Sept. 21, 2012) (No. 12-373).

Fourth Circuit: *Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke County,* 149 F.3d 277, 280 (4th Cir. 1998) ("The contractual waiver of a constitutional right must be a knowing waiver [and] must be voluntarily given . . . .").

Fifth Circuit: *Echavarria v. Pitts*, 641 F.3d 92, 94 n.1 (5th Cir. 2011) (Noting, in civil cases, that a "waiver of constitutional rights is not effective

22

unless the right is intentionally and knowingly relinquished." (quoting *Davis Oil Co. v. Mills,* 873 F.2d 774, 787 (5th Cir. 1989))).

Seventh Circuit:  *Bayo v. Napolitano*, 593 F.3d 495, 505 (7th Cir. 2010) (*en banc*) (holding that waiver of due process rights to a deportation hearing "must be done both knowingly and voluntarily").

Eighth Circuit: *In re Workers' Comp. Refund*, 46 F.3d 813, 819 (8th Cir. 1995). While the Eighth Circuit has not expressly endorsed a knowing and voluntary standard, it reads *Fuentes* as requiring at least that a contractual waiver of civil constitutional rights must "be clear and unambiguous."

Ninth Circuit: *Walls v. Cent. Contra Costa Transit Auth*., 653 F.3d 963, 969 (9th Cir. 2011) (per curiam) (holding that a waiver of both civil and criminal constitutional rights must be knowing and voluntary). Because the arbitration clause in this case is part of a contractual agreement, these holdings concerning contractual waivers of constitutional rights are definitely relevant.

Others argue that ordinary standards for waiver of constitutional rights cannot apply to the waiver of constitutional rights, because constitutional rights take precedence over contractual provisions.  As Professor Edward L. Rubin says,  "[T]he contract standard cannot be used to justify those waivers

23

that involve constitutional rights since such rights necessarily take precedence over the contract policy of honoring private agreements."[16]

Did Valerie enter into this arbitration agreement "voluntarily, knowingly, and intelligently"?

(1)    Voluntarily?    She was not forced at gunpoint to sign the agreement, but if she refused to sign it, she almost certainly would have lost her employment. It was a standard form agreement, drafted by the employer, and the employer clearly had the superior bargaining power. No one ever suggested to Valerie that the arbitration clause was in any way negotiable.

(2) Knowingly? The arbitration clause was never explained to her, it was never brought to her attention even though it was a departure from previous contracts, she never asked any questions about it, and she never consulted an attorney about it, nor was she advised that she could do so.

(3) Intelligently? When Valerie signed the agreement in 2009, she and other parties to this dispute undoubtedly assumed it affected standard employment issues such as work assignments, working conditions, grievances, sick pay, and other such matters. Neither she nor anyone else would ever have imagined that, over a decade later, she would be required to affirm concepts such as "gender is fluid" that violated her religious

---

[16] Edward L. Rubin, Toward a General Theory of Waiver, 28 UCLA L. REV. 478, 545 (1981)

24

convictions and her medical judgment, and that the arbitration agreement would be used to compel her to give up her constitutional right to sue in defense of her First Amendment rights.

Clearly, by signing this arbitration agreement, Valerie did not voluntarily, knowingly, and intelligently waive her First Amendment rights.

Furthermore, Michigan Health waited thirteen months after the commencement of litigation before asserting the arbitration clause, and then only after they lost the case in the District Court. Michigan Health wanted to have it both ways: first we'll try in court, and if that fails, we'll resort to arbitration. During those thirteen months, Valerie and her counsel have been forced to prepare for and endure costly and difficult litigation. This thirteen-month delay should be construed as a waiver of the arbitration clause.

## CONCLUSION

Considering the fundamental importance of the First Amendment rights at issue, and consider Michigan Health's bad faith in not asserting the arbitration clause until after they lost in the District Court, this Court should therefore reverse the order of the District Court and deny the motion for arbitration.

This Court should reverse in favor Plaintiff-Appellant.

Respectfully submitted,

25

John Eidsmoe*
*Counsel of Record
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@morallaw.org
talmadge@morallaw.org

Counsel for *Amicus Curiae*

August 7th, A.D. 2024

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., this document contains 6,472 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

*/s/ John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*

August 7th, A.D. 2024

## CERTIFICATE REGARDING SERVICE

I certify that on August 7th, A.D. 2024, a true copy of this document is being filed electronically (via CM/ECF) and will thereby be served on all counsel of record.

/s/ *John Eidsmoe*

John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
(334) 262-1245
eidsmoeja@juno.com

Counsel for *Amicus Curiae*