No. 24-1398

## In the United States Court of Appeals for the Sixth Circuit

———————————

VALERIE KLOOSTERMAN,
*Plaintiff-Appellant,*
v.
METROPOLITAN HOSPITAL, ET AL.,
*Defendants-Appellees.*

———————————

On Appeal from the U.S. District Court for the Western District of Michigan,
No. 1:22-CV-00944-JMB-SJB (Hon. Jane Beckering)

———————————

## AMICUS BRIEF OF *AMICI CURIAE* CATHOLIC MEDICAL ASSOCIATION, NATIONAL CATHOLIC BIOETHICS CENTER, NATIONAL ASSOCIATION OF CATHOLIC NURSES, AND CHRISTIAN EMPLOYERS ALLIANCE IN SUPPORT OF APPELLANT AND REVERSAL

———————————

Andrew Gould
Emily Gould
Daniel Tilleman
HOLTZMAN VOGEL BARAN
TORCHINKSY & JOSEFIAK, PLLC
2575 E. Camelback Road, Suite 860
Phoenix, AZ 85016
(602) 388-1262

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF AMICUS CURIAE .......................................................................1

ARGUMENT ..........................................................................................................3

    I.   Defendants Waived the Right to Seek Arbitration By Litigating This Case for a Year Through Numerous Substantive Motions. .....................4

    II.  The Arbitration Clause is Both Procedurally and Substantively Unconscionable Because of the Unequal Bargaining Power and Rights Granted in the Employment Contract. ......................................................5

        A.  The Arbitration Clause is Procedurally Unconscionable Because Kloosterman Lacked a Reasonable Opportunity to Negotiate and Unequal Bargaining Power. ...............................................................6

        B.  The Arbitration Clause is Substantively Unconscionable Because it Unreasonably Denies Kloosterman Opportunity to Seek Constitutional Redress. ........................................................................7

    III.  The Arbitration Clause Should be Held Void as Against Public Policy. ..9

        A.  The Arbitration Clause Violates Public Policy by Depriving Kloosterman the Opportunity to Protect Her Constitutional Rights. ..................................................................................................10

        B.  The Arbitration Clause Violates Public Policy by Curtailing Independent Medical Judgment ......................................................12

CONCLUSION ....................................................................................................15

CERTIFICATE OF COMPLIANCE ...................................................................15

CERTIFICATE OF SERVICE ............................................................................16

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Case Number: 24-1398　　　　Case Name: *Kloosterman v. Metro. Hosp., et al.*

Name of counsel:  Holtzman Vogel Baran Torchinsky & Josefiak PLLC by Andrew Gould

Pursuant to 6th Cir. R. 26.1, National Catholic Bioethics Center and National Association of Catholic Nurses make the following disclosure:

1.　　Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party: No

2.　　Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest: No

**Certificate of Service**

I certify that on August 7, 2024, the foregoing was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

# TABLE OF AUTHORITIES

CASES                                                              PAGE(S)

*14 Penn Plaza L.L.C. v. Pyett*,
   556 U.S. 247 (2009) ................................................................ 9

*Allen v. Mich. Bell Tel. Co.*,
   171 N.W.2d 689 (Mich. Ct. App. 1969) ............................... 7

*Brady v. United States*,
   397 U.S. 742 (1970) ...................................................... 10, 12

*Clark v. DaimlerChrysler Corp.*,
   706 N.W.2d 471 (Mich. Ct. App. 2005) ............................. 6, 7

*Cooper v. MRM Inv. Co.*,
   367 F.3d 493 (6th Cir. 2004) ................................................ 6

*Gillam v. Mich. Mortg. Inv. Corp.*,
   194 N.W. 981 (Mich. 1923) .................................................. 7

*Groff v. DeJoy*,
   600 U.S. 447 (2023) ...................................................... 10, 11

*Janny v. Gamez*,
   8 F.4th 883 (10th Cir. 2021) ......................................... 10, 11

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022) ............................................................ 10

*Lee v. Weisman*,
   505 U.S. 577 (1992) ............................................................ 10

*McDonald v. W. Branch*,
   466 U.S. 284 (1984) .............................................................. 9

*Morgan v. Sundance, Inc.*,
   596 U.S. 411 (2022) .............................................................. 4

*Newton v. Rumery*,
   480 U.S. 386 (1987) ............................................................ 10

*Nw. Acceptance Corp. v. Almont Gravel, Inc.*,

412 N.W.2d 719 (Mich. Ct. App. 1987) ............................................................. 6

*Pichey v. Ameritech Interactive Media Servs.*,
421 F. Supp. 2d 1038 (W.D. Mich. 2006) ...................................................... 6, 7

*Rudolph v. Lloyd*,
No. 17-10953, 2018 U.S. Dist. LEXIS 46210 (E.D. Mich. Mar. 21, 2018) ....... 9

*Schwebke v. United Wholesale Mortg. L.L.C.*,
96 F.4th 971 (6th Cir. 2024) ................................................................. 4

*Sherbert v. Verner*,
374 U.S. 398 (1963) ................................................................. 10, 11

*Smith v. Corizon Health Corp.*,
No. Case Number 18-10010, 2020 U.S. Dist. LEXIS 197931 (E.D. Mich. Oct.
23, 2020) ............................................................... 12-13

*Solo v. UPS Co.*,
947 F.3d 968 (6th Cir. 2020) .......................................................... 4, 5

*St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co.* ,
320 N.W.2d 244 (Mich. Ct. App. 1982) ............................................... 8

*Tripp v. Renaissance Advantage Charter Sch.*,
CIVIL ACTION NO. 02-9366, 2003 U.S. Dist. LEXIS 19834 (E.D. Pa. Oct. 8,
2003) ................................................................. 9

**STATUTES**

42 U.S.C.S. § 1395 (LexisNexis 2024) .................................................. 12
42 U.S.C.S. § 1983 (LexisNexis) ......................................................... 12

**RULES**

6th Cir. R. 26.1 ................................................................. iii, iv
6th Cir. R. 29, 32 .............................................................. 15

OTHER AUTHORITIES

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)......................................................................... 15

Brian Rood et. al, *Predictors of Suicidal Ideation in a Statewide Sample of Transgender Individuals*, 2(3) LGBT Health 270, 270 (2015), https://ncbi.nlm.nih.gov/pmc/articles/PMC4713016/ ..................................... 14

Catholic Medical Association, https://www.cathmed.org/about/ ......................... 2

Christian Employers Alliance, https://christianemployersalliance.org/ ............... 2

Committee on Doctrine, U.S. Conference of Catholic Bishops, *Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* (2023), https://www.usccb.org/resources/Doctrinal%20Note%202023-03-20.pdf ..... 12

Daniel Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15(3) Cureus (2023), https://www.cureus.com/articles/145464-suicide-related-outcomes-following-gender-affirming-treatment-a-review#!/ ........................................................... 13

Dicastery for the Doctrine of the Faith, *"Dignitas Infinita" on Human Dignity*, Vatican Press (2024), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2024/04/08/24 0408c.html................................................................................................... 11

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. of Transgender Health (2022) S1, https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ...... 14

Jay Greene, *Puberty Blockers, Cross-Sex Hormones, and Youth Suicide*, Heritage Foundation (2022), https://www.heritage.org/gender/report/puberty-blockers-cross-sex-hormones-and-youth-suicide?ute_source=twitter&utm_medium=social&utm_campaign=thf-tw ... 14

James Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives of

Sexual Behavior 1045 (2023), https://link.springer.com/article/10.1007/s10508-023-02588-5 ................................................................................................... 10

National Association of Catholic Nurses, USA, https://nacn-usa.org/about/about-nacn/ ..................................................................................................................... 1

National Catholic Bioethics Center, https://www.ncbcenter.org/ ........................ 1

National Institute for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* (2021), https://tinyurl.com/bdcb7y8b ............................................................ 14

**INTEREST OF AMICUS CURIAE**

The National Catholic Bioethics Center ("NCBC") is a non-profit corporation founded in 1972 to provide education, guidance, and resources to the Church and society to uphold the dignity of the human person in health care and biomedical research. NCBC consults with institutions and individuals in the health care industry regarding the appropriate application of Catholic teachings. NCBC publishes commentary and hosts biannual workshops for North American bishops in Dallas, Texas.[1]

The National Association of Catholic Nurses USA ("NACN-USA") is a non-profit 501(c)(3) organization committed to giving nurses the opportunity to promote Catholic moral principles and stimulate desire for professional development. NACN-USA provides educational programs, religious edification, patient advocacy, and an environment integrating faith and health for Catholic nurses. NACN-USA also provides guidance, support, and networking for Catholic nurses, nursing students, and other professionals.[2]

The Catholic Medical Association ("CMA") is the largest association of Catholic individuals in health care. CMA's mission is to help its members maintain

---

[1] *See generally* National Catholic Bioethics Center, https://www.ncbcenter.org/.

[2] *See generally* National Association of Catholic Nurses, USA, https://nacn-usa.org/about/about-nacn/.

ethical integrity and provide excellent health care according to the teachings of the Catholic Church, while fostering a commitment to the Hippocratic approach to medicine. CMA provides educational resources and events for medical students, bishops, and other national leaders. It also advocates for its members, the Catholic Church, and other medical professionals.[3]

The Christian Employers Alliance ("CEA") is an organization serving Christian-owned businesses of for-profit companies and non-profit organizations. CEA's mission is to unite, equip, and represent Christian-owned businesses to protect religious freedom and provide the opportunity for employees, businesses, and communities to flourish. CEA challenges laws and regulations hostile to religious freedom on behalf of Christian-owned businesses and serves as a voice of Christian business leaders to Capitol Hill, the media, and the marketplace.[4]

NCBC, NACN-USA, CMA, and CEA are deeply concerned about Appellee Metropolitan Hospital's (the "Hospital") efforts to compel arbitration of disputes with employees involving First Amendment claims, especially where the sanctity of independent medical judgment is at stake. These organizations and their members fear that requiring arbitration will undermine the integrity of the healthcare system, the conscience rights of health care professionals, and the safety of patients. For

---

[3] *See generally* Catholic Medical Association, https://www.cathmed.org/about/.
[4] *See generally* Christian Employers Alliance, https://christianemployersalliance.org/.

these reasons, these organizations offer the following arguments to assist the Court as it addresses the questions presented here.

## ARGUMENT

The District Court's order forcing Appellant Valerie Kloosterman, a state employee fired for exercising her religious beliefs, to arbitrate her First Amendment claims is wrong for at least three reasons.

First, the defendants below (the "Defendants") waived their right to compel arbitration by litigating this case for a full year—the quintessential example of a party abandoning their right to compel arbitration.

Second, the arbitration clause is procedurally and substantively unconscionable. The record establishes that Ms. Kloosterman had no opportunity to negotiate the clause, which, if read as the Hospital requests, would require that Ms. Kloosterman blindly waive her freedom of conscious under the First Amendment and independent medical judgement regarding gender affirming care in 2004, nearly *two decades* before such care became commonplace. Contemplating an innocuous arbitration clause applying to employment-related claims, Ms. Kloosterman could not have predicted that.

Third, the clause should be void as contrary to public policy because it prevents Ms. Kloosterman, a state employee, from exercising her First Amendment rights and independent medical judgment, likewise preventing courts from

addressing novel issues of religious freedom in the face of gender affirming care and

developing precedent on this vital question.

## I.    Defendants Waived the Right to Seek Arbitration By Litigating This Case for a Year Through Numerous Substantive Motions.

Contrary to the District Court's interpretation of *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court has not required that the Hospital expressly waive the right to compel arbitration. Instead, a party waives its right to seek arbitration when it "act[s] inconsistently" with reliance on that right. *Morgan v. Sundance, Inc.,* 596 U.S. 411, 417, 419 (2022) (remanding for the Court of Appeals to examine only the "conduct" of the defendant over eight months in litigation); *see also Schwebke v. United Wholesale Mort., LLC*, 96 F.4th 971, 974–75 (6th Cir. 2024).

Actions inconsistent with a contractual right to arbitration include, litigating for months—even years—by "filing motions to dismiss, answering complaints,[] discussing settlement," and engaging in discovery disputes.  *Morgan*, U.S. at 413; *see also Schwebke*, 96 F.4th at 974–75 (to same effect).

The decision in *Solo v. United Parcel Service Co.* is analogous. 947 F.3d 968, 975 (6th Cir. 2020). There, defendants' motions to dismiss were "thoroughly enmeshed in the merits" and "sought dismissal of all claims," and it was not until after an "unfavorable decision on the merits" that defendants "change[d] course," seeking arbitration. *Id.*  In fact, although the *Solo* defendants reserved the right to

compel arbitration in their motion to dismiss, the Sixth Circuit still determined that defendants' "actions were inconsistent with reliance on an arbitration agreement" and constituted actual prejudice. *Id.* at 975–77.

Here, the Hospital did precisely that. The Hospital engaged in litigation for a year—from October 2022 to October 2023—filing numerous briefs and substantive motions, assiduously opposing Kloosterman's motion to amend her complaint, and preparing for discovery. *See* P. Opp. to D. Mot. for Summ. J. at 3. During that year, Defendants never mentioned arbitration or sought to exercise any purported right to compel arbitration. *Id.* at 8. It was not until November 2023, after two failed attempts to dismiss *all* of Ms. Kloosterman's claims, that Defendants sought summary judgment to compel arbitration. *Id.* at 3.

The Hospital manifestly waived its right to compel arbitration by this conduct. Reversal is warranted on this ground alone.

## II. The Arbitration Clause is Both Procedurally and Substantively Unconscionable Because of the Unequal Bargaining Power and Rights Granted in the Employment Contract.

The arbitration clause is also unenforceable because it is both procedurally and substantively unconscionable. As to procedural unconscionability, Ms. Kloosterman, unrepresented by counsel, had essentially no bargaining power and no chance to negotiate the clause with the Hospital. And as to substantive unconscionability, the reach of the clause is unreasonable under Michigan law. Ms. Kloosterman,

unrepresented, could not have understood that the clause would one day avert her recourse in court when she was forced, nearly two decades later, to provide medical intervention that violated her sincerely held religious beliefs. Simply, this clause holds an *uninformed* waiver of a medical practitioner's ability to bring her First Amendment claims into court.

To determine whether a contract is unenforceable, federal courts look to "generally applicable state-law contract defenses," including "unconscionability." *Cooper v. MRM Invest. Co.*, 367 F.3d 493, 498 (6th Cir. 2004). Under Michigan law, contract provisions are unenforceable if "both procedural and substantive unconscionability [are] present." *Clark v. DaimlerChrysler Corp.*, 706 N.W.2d 471, 474 (Mich. Ct. App. 2005); *see also Nw. Acceptance Corp. v. Almont Gravel, Inc.*, 412 N.W.2d 719, 722–23 (Mich. Ct. App. 1987).

>   A. The Arbitration Clause is Procedurally Unconscionable Because Kloosterman Lacked a Reasonable Opportunity to Negotiate and Unequal Bargaining Power.

When one party has no realistic alternative to agreeing to a contract, it is procedurally unconscionable, meaning the weaker party was not free to accept or reject the term. *Pichey v. Ameritech Interactive Media Servs.*, 421 F. Supp. 2d 1038, 1045 (W.D. Mich. 2006). Put another way, courts refuse to enforce contract provisions when "'one party is at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.'"

*Pichey*, 421 F. Supp. 2d at 1045 (quoting *Allen v. Mich. Bell Tel. Co.*, 171 N.W.2d 689, 693 (Mich. Ct. App. 1969)).

Here, the disparity in bargaining power between Kloosterman and the Hospital forced Kloosterman to accept whatever arbitration provision the contract contained. *See Pichey*, 421 F. Supp. 2d at 1045. When she signed the contract, Kloosterman was a young Physician Assistant at the beginning of her career; the Hospital, on the other hand, was a massive healthcare entity that had existed in the region long enough to employ generations of Kloosterman's family. *See* 2d Am. Compl. ¶¶ 50–51. A "fair appraisal" of Kloosterman's situation, including her comparatively lower degree of sophistication as a layperson, shows that she had little reasonable opportunity to reject the term. *See Clark*, 706 N.W.2d at 475. There is no evidence that the Hospital would have entertained a negotiation. Thus, there was no realistic alternative to the Hospital's contract. Kloosterman was at the mercy of the Hospital.

> B. The Arbitration Clause is Substantively Unconscionable Because it Unreasonably Denies Kloosterman Opportunity to Seek Constitutional Redress.

Substantive unconscionability occurs when a term is unreasonable, such that it "is so extreme as to shock the conscience." *Clark*, 706 N.W.2d at 475; *see also Gilliam v. Mich. Mort.-Inv. Corp.*, 194 N.W. 981 (Mich. 1923). "'Reasonableness [of the provision] is the primary consideration.'" *Pichey*, 421 F. Supp. 2d at 1049

(quoting *St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co.*, 320 N.W.2d 244, 257 (Mich. Ct. App. 1982)). In assessing reasonableness, courts should consider the provision's purpose, effect, and the commercial setting. *Id.*

Because the clause unreasonably requires that Kloosterman waive her claims under the First Amendment related to her own medical judgment, it is substantively unconscionable. The clause dictates that "[a]ny controversy, dispute or claim arising out of or relating to this Agreement, or the breach thereof," is subject to arbitration. Pl's. Opp'n to Defs.' Mot. for Summ. J. to Compel Arb. 2.

While the purpose of this clause may have been to select arbitration as a dispute resolution method for the *employment terms of the contract*, the provision's effect limits Kloosterman's ability to seek recourse for forced practice of medicine that violates her right of conscious—i.e., *prevents* her from practicing her religion. Although not clear to a layperson's reading of the clause, it waives Kloosterman's ability to bring her constitutional claims—none of which could have been contemplated at the time of signing—before a jury or in a court of law. Kloosterman executed the employment contract almost *two decades ago* when she commenced work with the Hospital in 2004—well before the recent explosion in gender dysphoria in the United States. Indeed, the clause robs Kloosterman of legal entitlements extending far beyond the terms of an ordinary employment contract.

8

An arbitrator selected pursuant to the arbitration clause is unlikely to have the authority or expertise to adjudicate specialized constitutional claims of a medical practitioner. Federal courts have recognized that "arbitration is a fundamentally inappropriate forum for the resolution of a constitutional claim." *Tripp v. Renaissance Advantage Charter Sch.*, No. 02-9366, 2003 U.S. Dist. LEXIS 19834, at *26 (E.D. Pa. Oct. 8, 2003). By way of example, the Supreme Court has recognized that arbitration "cannot provide an adequate substitute for a judicial proceeding" in § 1983 claims. *McDonald v. West Branch*, 466 U.S. 284, 290 (1984) ; *Rudolph v. Lloyd*, No. 17-10953, 2018 U.S. Dist. LEXIS 46210, *10 (E.D. Mich. Mar. 21, 2018); *but see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 268–69, n. 10 (2009) (criticizing, in dictum, *McDonald*'s reasoning, as it applied to age-discrimination under Title VII where it would be subject to judicial review anyway under the Federal Arbitration Act).

Kloosterman's arbitration clause should be deemed unconscionable.

## III. The Arbitration Clause Should be Held Void as Against Public Policy.

Enforcement of the arbitration clause would violate public policy for at least two reasons. First, it would resign Kloosterman's case to a decision by binding arbitration, preventing Kloosterman from having her First Amendment rights—and indeed, her conscience—vindicated in court and by a jury of her peers. Second, it

would undermine the federally-recognized policy of ensuring health care professionals exercise independent judgment.

A. The Arbitration Clause Violates Public Policy by Depriving Kloosterman the Opportunity to Protect Her Constitutional Rights.

The Supreme Court cautions that upholding a waiver of constitutional rights requires that it be a "voluntary . . . [,] knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). While a voluntary waiver of rights is permissible, there is a "public interest opposing involuntary waiver of constitutional rights." *Newton v. Rumery*, 480 U.S. 386, 394 (1987).

The First Amendment protects religious expression, which is "too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, 505 U.S. 577, 589 (1992). The Free Exercise Clause "protect[s] the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Protection of the Free Exercise Clause is vital, evidenced by the fact that employers must accommodate religious beliefs absent an undue hardship. *Groff v. DeJoy*, 600 U.S. 447, 472 (2023). The government may not "'penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities.'" *Janny v. Gamez*, 8 F.4th 883, 903 (10th Cir. 2021) (quoting *Sherbert v. Verner*, 374 U.S. 398, 402 (1963)).

Kloosterman's ability to practice her First Amendment rights are at stake. Kloosterman is a devout Christian and believes that men and women are made in God's image. *See* 2d Am. Compl. ¶¶ 30–40. According to her genuine, religiously grounded belief, gender affirming care violates God's ordained plan. *Id.* Kloosterman is not alone in her beliefs regarding gender affirming care and the nature of mankind as made in the image of God. In fact, Christians around the world believe mankind was fashioned by God as male and female. *See Genesis* 1:26–27. Just this year, the Catholic Church stated that the efforts to elide the differences between men and women and the resultant attempts at "sex-change" may "threaten[] the unique dignity [of] the person."[5] The U.S. Conference of Catholic Bishops described gender reassignment procedures as "not respect[ing] the fundamental order of the human person as an intrinsic unity of body and soul."[6]

Kloosterman's fundamental religious beliefs should not be penalized because a state hospital disagrees with her views. *See Janny*, 8 F.4th at 903. The Hospital must accommodate Kloosterman's practice of her religion. *See Groff*, 600 U.S. at 472; *See* 2d Am. Compl. ¶ 208. To subject review of their failure to arbitration would

---

[5] Dicastery for the Doctrine of the Faith, *"Dignitas Infinita" on Human Dignity* ¶¶ 55-60, Vatican Press (2024), https://press.vatican.va/content/salastampa/en/bollettino/pubblico/2024/04/08/240408c.html.

[6] Committee on Doctrine, U.S. Conference of Catholic Bishops, *Doctrinal Note on the Moral Limits to Technological Manipulation of the Human Body* ¶ 18 (2023), https://www.usccb.org/resources/Doctrinal%20Note%202023-03-20.pdf.

compound the injury by serving as an involuntary waiver of Kloosterman's ability to vindicate her constitutional rights in court.

Kloosterman agreed to the arbitration clause without knowing her ability to vindicate her right to conscience was at stake. Kloosterman has not, and could not have, "voluntari[ly]" and "knowing[ly]" waived her constitutional rights, *Brady*, 397 U.S. at 748, when such rights were not at stake when she signed the contract. *See* Pl.'s Opp'n to Defs.'Mot. for Sum. J. to Compel Arb. 1–2.

> B. The Arbitration Clause Violates Public Policy by Curtailing Independent Medical Judgment.

Requiring arbitration of Kloosterman's dispute would also contravene the public policy that health care professionals should make decisions according to their medical judgment. This principle is enshrined in federal law. For instance, federal health insurance law provides that "[n]othing in this title ... shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C.S. § 1395 (2024).

This axiomatic principle of healthcare has been acknowledged by courts time and again. For example, "[i]n the context of a section 1983 claim for deliberate indifference, '[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances.'" *Smith v. Corizon Health Corp*, No. 18-10010, 2020

12

U.S. Dist. LEXIS 197931 (E.D. Mich. Oct 23, 2020) (citation omitted). So far as Kloosterman has acted as a "minimally competent professional," courts (and her employer) should respect her medical decisions without interference.

Kloosterman's objection to referring patients to gender-affirming care is a medically sound position.[7] By way of example, a statistical analysis from 2022 establishes that lowering state-level legal barriers to transgender medical intervention for children ages 12–23 is associated with *higher* suicide rates.[8] According to the England National Health Service review, there is "limited evidence for the effectiveness and safety of gender-affirming hormones in children," and the "long-term safety profile of these [interventions]" is "largely unknown."[9] Even WPATH, a vocal and staunch advocate of gender-affirming care, admits that "the number of studies" on this topic "is still low," and "the long-term effects of gender-

---

[7] Studies purporting to find lower suicide rates for people receiving gender-affirming care suffer from a variety of methodological errors, such as lack of proper controls. *See* Jackson, *Suicide-Related Outcomes Following Gender-Affirming Treatment: A Review*, 15(3) Cureus 13 (2023), https://www.cureus.com/articles/145464-suicide-related-outcomes-following-gender-affirming-treatment-a-review#!/.

[8] Greene, *Puberty Blockers, Cross-Sex Hormones, and Youth Suicide*, Heritage Foundation (2022), https://www.heritage.org/gender/report/puberty-blockers-cross-sex-hormones-and-youth-suicide?ute_source=twitter&utm_medium=social&utm_campaign=thf-tw

[9] National Institute for Health & Care Excellence, *Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria* 50 (2021), https://tinyurl.com/bdcb7y8b.

affirming [interventions] initiated in adolescence are not fully known."[10] In light of these dangers, Kloosterman would arguably violate the standard of a medical professional by  providing gender-affirming care.

Kloosterman's opposition to biology-obscuring pronouns is, at worst, a *minimally* competent medical judgment. A recent UK study measured the effects of social transitioning and name changes and found that "[o]verall, there were no significant effects of social transition or name change on mental health status."[11] Another study of 350 transgender people in Virginia found that those who underwent full social transitioning or were planning to transition were *more* likely to experience suicidal thoughts than those who did not.[12] In cases involving adolescents, scientific evidence does not support the assertion that failure to use a child's preferred pronoun will result in long-term negative consequences for most children. In fact, up to 98

---

[10] Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. of Transgender Health S1, S46, S65 (2022), https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

[11] Morandini et al., *Is Social Gender Transition Associated with Mental Health Status in Children and Adolescents with Gender Dysphoria?*, 52 Archives of Sexual Behavior 1045, 1045 (2023), https://link.springer.com/article/10.1007/s10508-023-02588-5.

[12] Rood et. al, *Predictors of Suicidal Ideation in a Statewide Sample of Transgender Individuals*, 2(3) LGBT Health 270, 270 (2015), https://ncbi.nlm.nih.gov/pmc/articles/PMC4713016/.

percent of transgender-identifying adolescent boys, and up to 88 percent of girls, end up identifying with their biological sex later in life.[13]

By preventing courts from hearing a question regarding the ability of government employees to restrict a physician's medical decisions—a question of vital importance to public policy and federal law—this court would contravene public policy. Defendants now seek to exasperate this violation by having an arbitrator adjudicate the dispute. Simply put, arbitration is not the appropriate venue to decide this issue. Courts, which possess the power to adjudicate and enforce the public policy of the state, are the proper venue for this question.

## CONCLUSION

This Court has the power to protect Kloosterman's conscience and independent medical judgment. Because the Hospital waived its right to compel arbitration, and because the arbitration clause in Kloosterman's contract is both unconscionable and a violation of public policy, the Western District of Michigan's decision should be reversed.

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing complies with Rules 29 and 32 of the Appellate Rules of Civil Procedure.

---

[13] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 455 (5th ed. 2013).

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing amicus brief was filed this 7th day of August,

2024, through the Court's Electronic Filing System.


Dated: August 7, 2024                          _/s/ Andrew Gould_____